UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

JOSEPH BARTFIELD,

                 Plaintiff,                      06 CV 6435 (RJH) (HP)

       v.

JAMES B. MURPHY, J.B. MURPHY
ASSOCIATES LLC, STANDARD SECURITY
LIFE INSURANCE COMPANY OF NEW YORK,
and CFE MANAGEMENT LLC,

                 Defendants.

------------------------------------------------------------------X

## DEFENDANTS' MEMORANDUM OF LAW IN
## SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Lynn & Cahill LLP
500 Fifth Avenue, 14th Floor
New York, New York 10110
(212) 719-4400

## Table of Contents

Page

Table of Authorities ............................................................ iii

Preliminary Statement ......................................................... 1

Statement of Facts ............................................................. 3

    1.  Background ............................................................. 3

    2.  RMTS, the Formation of CFE and the Prior Lawsuit ................... 4

    3.  The Operation of CFE and the MGU Agreement ........................ 6

    4.  The Decision of Bartfield and Murphy to
        Part Company and Go Their Separate Ways ............................ 6

    5.  The Run-Out ........................................................... 10

    6.  Bartfield's Efforts to Start a New Business .......................... 11

    7.  The 2004 Agreement Between Standard Security
        and Murphy Associates .............................................. 13

ARGUMENT

THE AMENDED COMPLAINT SHOULD BE DISMISSED
AS A MATTER OF LAW ......................................................... 14

    POINT I

    MURPHY DID NOT BREACH ANY DUTY TO BARTFIELD ....................... 15

    A.      Bartfield Expressly Agreed to Terminate CFE's Business ........... 16

    B.      The MGU Agreement Expressly Permitted Termination
          by Either Party .................................................... 17

    C.      Murphy's Formation of a New Business Did Not
          Constitute a Breach of Fiduciary Duty ............................ 18

    D.      Murphy Did Not – and Could Not – Exclude Bartfield
          from the Management of CFE ....................................... 20

POINT II

NEITHER BARTFIELD NOR MURPHY HAS ANY
ACTIONABLE INTEREST IN CFE'S SO-CALLED BOOK
OF BUSINESS                                                    21

POINT III

MURPHY AND MURPHY ASSOCIATES WERE NOT
UNJUSTLY ENRICHED                                             22

POINT IV

MURPHY ASSOCIATES DID NOT AID AND ABET ANY
BREACH OF FIDUCIARY DUTY                                      23

POINT V

BARTFIELD SHOULD BE ESTOPPED FROM ASSERTING
THE CLAIMS SET FORTH IN THE AMENDED COMPLAINT                 23

    A.    The Amended Complaint Is Barred by the
        Doctrine of Judicial Estoppel                        23

    B.    The Amended Complaint Is Barred by the
        Doctrine of Equitable Estoppel                       24

Conclusion                                                    25

**Table of Authorities**

Page

**Cases**

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986);                    14

*Bartfield v. RMTS Associates, LLC*, 11 A.D.3d 386,
783 N.Y.S.2d 560 (1st Dep't 2004)                    5,24

*Carruthers v. Flaum,* 388 F. Supp. 2d 360 (S.D.N.Y.2005)                    15

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986)                    14

*Colotone Liquidating Trust v. Bankers Trust New York Corp.*
243 B.R. 620 (S.D.N.Y. 2000)                    15

*Davis v. Wakelee*, 156 U.S. 680 (1895)                    24

*Environmental Concern, Inc. v. Larchwood Construction Corp.*,
101 A.D.2d 591, 476 N.Y.S.2d 175 (2d Dep't 1984)                    23

*Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 49 F.Supp.2d 298
(S.D.N.Y. 1999)                    22

*In re Ionosphere Clubs, Inc.*, 85 F.3d 992 (2d Cir. 1996)                    24

*In re Sharp Int'l Corp.*, 403 F.3d 43 (2d Cir. 2005)                    23

*Kaufman v. Cohen,* 307 A.D.2d 113, 760 N.Y.S.2d
157 (1st Dep't 2003)                    23

*Mitchell v. Washingtonville Central School District*,
190 F.3d 1 (2d Cir. 1999)                    23

*Nay v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
2006 WL 2109467 (S.D.N.Y. Jul. 25, 2006)                    15

*Samuels v. Mockry,* 77 F.3d 34 (2d Cir.1996);                    14

*Shondel J. v. Mark D.*, 7 N.Y.3d 320, 820
N.Y.S.2d 199 (2006)                    24

**<u>Statutes</u>**

Fed. R. Civ. P. 56(c)                                                    14

N.Y. Limited Liability Company Law § 601                                 21

**<u>Secondary Authorities</u>**

B. Schorr, *New York Limited Liability Companies
   & Partnerships* § 601 (2000)                                          21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

JOSEPH BARTFIELD,

             Plaintiff,                          06 CV 6435 (RJH) (HP)

         v.

                                            ECF Case

JAMES B. MURPHY, J.B. MURPHY
ASSOCIATES LLC, STANDARD SECURITY
LIFE INSURANCE COMPANY OF NEW YORK,
and CFE MANAGEMENT LLC,

             Defendants.
------------------------------------------------------------X

## DEFENDANTS' MEMORANDUM OF LAW IN
## SUPPORT OF MOTION FOR SUMMARY JUDGMENT

      Defendants James B. Murphy and J.B. Murphy Associates LLC ("Murphy Associates")

respectfully submit this memorandum of law in support of their motion pursuant to Fed R. Civ.

P. 56 for summary judgment dismissing the amended complaint of plaintiff Joseph Bartfield.[1]

### Preliminary Statement

      Having agreed to terminate his business relationship with Murphy, and thereafter having

unsuccessfully sought to establish a business in the same field on his own, without Murphy,

Bartfield now brings this action against Murphy for doing precisely what they both agreed they

were each free to do.

      Bartfield and Murphy were at all times (and technically remain) the sole members of

CFE, each owning 50% of the Company.  CFE contracted to act as a managing general

---

[1] The Amended Complaint is attached as Exhibit A to the Declaration of James P. Lynn dated January 28, 2008 ("Lynn Decl.").  Plaintiff has voluntarily dismissed the action against defendant Standard Security Life Insurance Company of New York ("Standard Security") without prejudice.  Although CFE Management LLC ("CFE") is

underwriter ("MGU") of medical stop loss insurance for Standard Security pursuant to a Management Agreement between the parties effective May 1, 2000 (the "MGU Agreement").

In September 2003, Bartfield and Murphy jointly notified Standard Security in writing "of [their] decision to part company and go [their] separate ways."

Pursuant to its reinsurance agreement, Standard Security forwarded that notice to its reinsurer; the reinsurer then cancelled the reinsurance program, and Standard Security terminated the MGU Agreement.  Thus, CFE was no longer authorized to issue medical stop loss insurance on behalf of Standard Security; however, it remained contractually obligated to service the policies in force at the termination of the MGU Agreement.

Although Bartfield and Murphy each subsequently requested that Standard Security appoint them individually as MGUs in September 2003, Standard Security did not approve either of their requests.  Thereafter, through mid-2004, Bartfield actively sought to do business with a number of carriers, reinsurers and other MGUs.  Throughout that time, Bartfield kept in contact with a number of CFE's producers, as he fully intended to do business with those producers if he received authorization to be an MGU.  Despite his efforts, however, Bartfield was not appointed as an MGU or to any other position in the medical stop loss insurance industry.

On or about May 1, 2004, Standard Security appointed Murphy as an MGU.  To that point, Murphy had continuously worked to fulfill CFE's contractual obligations under its MGU Agreement, and had stated his intention of continuing to do so until all tasks were complete.

The amended complaint alleges that Murphy breached his fiduciary duty to Bartfield and was unjustly enriched by entering upon a scheme to deprive Bartfield of and exclude him from

---

identified as a defendant in the caption, no claim is asserted against CFE in the Amended Complaint.

2

his interest in CFE's "Book of Business."  The claims against Murphy Associates are derivative of those claims, and consist of the allegations that Murphy Associates aided and abetted Murphy's breach of fiduciary duty and was unjustly enriched thereby.

There is no evidence of any such scheme, there is no evidence that Murphy sought to exclude Bartfield from the benefits of the business that had been written by CFE, and there is no evidence that Murphy interfered with Bartfield's attempts to start a new business.  Rather, the evidence shows that some eight months after Bartfield had agreed in writing that Murphy was free to pursue an MGU business, Murphy did just that and entered into a new contract with Standard Security.  Moreover, by fulfilling CFE's obligations under the MGU Agreement, Murphy generated millions of dollars in revenues to CFE since December 2003, and the liquidated value of CFE's true "Book of Business" – its contractual compensation – is currently in CFE's bank accounts.

## Statement of Facts

### 1.   Background

Bartfield and Murphy organized CFE on November 9, 1999 to be a managing general underwriter ("MGU") in the medical stop loss insurance field.  (Amended Complaint ¶ 11 [Lynn Decl. Ex. A]; Bartfield Dep. at 38 [Lynn Decl. Ex. U].)

Medical stop loss insurance is typically obtained by a single large organization or a group of smaller organizations who have chosen to self-insure their employees' medical expenses up to a pre-determined level of exposure.  Stop loss insurance covers medical expenses that exceed the self-insured's exposure limit.  (Bartfield January 17, 2000 Affidavit ¶ 4(a) [Lynn Decl. Ex. D].)

The employer group appoints an independent broker or agent (a producer) to locate the best available medical stop loss insurance.  As producers are required to present their clients with the best available quotes, they gather all of the data relative to the particular self-insured group's historic medical costs and submit such data at each annual anniversary date of coverage to three to five MGUs to allow them to quote on the cost of the stop loss insurance on behalf of the insurance companies they represent.  (*Id.* ¶¶ 4(c), 15.)

The MGU is authorized by an insurance company to underwrite and quote on such business to the producers, to bind coverage and issue policies, to collect and distribute premium, and to adjust and pay claims on the policies issued.  (*Id.* ¶ 4(d).)  The MGU receives two forms of compensation:  (i) on the front-end, a Manager Fee, which is a percentage of the gross collected premium of the business it writes, and (ii) on the back-end, a percentage of the insurance carrier's profit on such business.  (MGU Agreement Exhibit D and Amendment No. 1 [Lynn Decl. Ex. E]; Murphy Dep. at 12-14 [Lynn Decl. Ex. X].)  Because such policies typically have long tails before all the claims are processed, it can take several years to determine the carrier's (and the MGU's) profit on such business.

### 2.   RMTS, the Formation of CFE and the Prior Lawsuit

Murphy has been in the MGU business since 1986, when he became a shareholder in an MGU known as RMTS Associates ("RMTS").  (Murphy Dep. at 5-6 [Lynn Decl. Ex. X].)  In 1997, Bartfield, an attorney who had no prior experience as an MGU, joined RMTS.  (Bartfield Dep. at 5-6, 17, 20-21 [Lynn Decl. Ex. U].)

In late 1999, Bartfield and Murphy left RMTS and started CFE.  On behalf of CFE, Bartfield and Murphy immediately began contacting the producers with whom they had worked

at RMTS and issued quotes on, *inter alia*, the renewal of policies that had been written at RMTS. (Bartfield Affidavit ¶¶ 17-18 [Lynn Decl. Ex. D]; Bartfield Dep. at 49-50 [Lynn Decl. Ex. U].) Indeed, all of the producers of January 2000 business written by CFE had been producers of RMTS business. (Bartfield Dep. at 54-57 [Lynn Decl. Ex. U].) Moreover, CFE issued a number of renewals for accounts that had policies previously issued by RMTS; significantly, CFE did not pay RMTS any consideration for such renewal policies. (*Id.* at 50, 54-56.)

During the ensuing litigation stemming from the departure of Bartfield and Murphy, RMTS claimed that they had breached their fiduciary duties by setting up a competing MGU and soliciting business from producers with whom they had dealt at RMTS. In defense, Bartfield and Murphy asserted that soliciting the renewals of policies written by RMTS after they had left RMTS did not constitute a breach of fiduciary duty. In April 2004, the New York State Supreme Court, New York County, dismissed RMTS's claims at the close of its case, and the Appellate Division affirmed, holding that "[t]he discussions between Murphy and Bartfield to create a company that would compete with RMTS, and the subsequent steps that were taken to form the competing company, did not constitute breaches of their fiduciary duties." *Bartfield v. RMTS Associates, LLC*, 11 A.D.3d 386, 387, 783 N.Y.S.2d 560, 561 (1st Dep't 2004).


    **3.**      **The Operation of CFE and the MGU Agreement**

Although CFE initially acted on behalf of another carrier, it became a managing general underwriter for Standard Security pursuant to the MGU Agreement. (Lynn Decl. Ex. E.) From May 1, 2000 until September 2003, CFE issued medical stop loss insurance policies solely for Standard Security. (Amended Complaint ¶ 22 [Lynn Decl. Ex. A].)

The MGU Agreement provides that either party may terminate the Agreement on 90-days' written notice to the other party.  (MGU Agreement at 11, § X.B. [Lynn Aff. Ex. E].)  The MGU Agreement further provides that Standard Security may terminate the Agreement immediately in the event that the "reinsurance with respect to the Policies is canceled, modified, diminished or otherwise altered."  (*Id.* § X.B.1. (c).)

### 4.    The Decision of Bartfield and Murphy to Part Company and Go Their Separate Ways

In or about 2003, certain issues arose between Bartfield and Murphy concerning CFE's business.  Murphy testified that he was unhappy with the underwriting decisions that Bartfield had been making, and that notwithstanding Murphy's frequent discussions with Bartfield on the subject, Bartfield continued to underwrite business that Murphy believed to be unprofitable.  (Murphy Dep. at 12, 15-30, 51-57 [Lynn Decl. Ex. X].)

Although in his testimony Bartfield denied that there were any issues between him and Murphy, he did admit that there was some tension between him and Murphy during the claims audit in June or July 2003.  (Bartfield Dep. at 145-46, 202 [Lynn Decl. Ex. U].)  Moreover, Rachel Lipari, Standard Security's President, testified that Bartfield had told her in May or June of 2003 that he and Murphy were not getting along and that Bartfield was thinking of leaving Murphy.  (Lipari Dep. at 33, 47-52 [Lynn Decl. Ex. W].)  Finally, David Kettig, Standard Security's Senior Vice President and Chief Administrative Officer, testified that there were serious disagreements between Bartfield and Murphy. (Kettig Dep. at 27-28 [Lynn Decl. Ex. V].)

Regardless of the reasons, which are not legally material to this motion, it is undisputed that by letter dated September 4, 2003, on CFE letterhead and signed by both of them, Bartfield

6

and Murphy jointly notified Standard Security "of [their] decision to part company and go [their] separate ways."  The letter further advised that Bartfield and Murphy would "both remain actively involved in the runout of existing business underwritten by CFE Management LLC on behalf of Standard Security in 2000, 2001, 2002 and 2003."  (Lynn Decl. Ex. F.)

That notice from Bartfield and Murphy had immediate repercussions.  In accordance with its obligations under its reinsurance treaty, Standard Security forwarded the letter from Bartfield and Murphy to Everest Reinsurance Company ("Everest"), the reinsurer of the business written by CFE.  (Lynn Decl. Ex. G.)  By letter dated September 8, 2003, Everest tendered notice of cancellation of the reinsurance program for that business.  (Lynn Decl. Ex. H.)  By letter also dated September 8, 2008, Standard Security forwarded Everest's notice of cancellation to CFE, and terminated the MGU Agreement as of December 9, 2003.[2]  (Lynn Decl. Ex. I.)

By separate letters to Standard Security dated September 8, 2003, Bartfield and Murphy each requested that they be appointed as MGUs by Standard Security.  (Lynn Decl. Exs. K and L.)  In Bartfield's letter, he acknowledged that "[w]e understand that Jim will likewise seek similar objectives."  (Lynn Decl. Ex. L.)  Bartfield testified that he understood that Murphy would similarly hope to continue with the producer relationships created and nurtured in the past at CFE.  (Bartfield Dep. at 288 [Lynn Decl. Ex. U].)

In fact, Murphy and Bartfield each advised Standard Security in writing that he had no objection to the other applying to be an MGU with Standard Security.  Murphy sent an e-mail dated September 8, 2003 to Standard Security, with a copy to Bartfield, stating:  "Joe has requested I confirm to you that I have no problem with him applying to [Standard Security] as an

---

2 Pursuant to Section X.B.1(c) of the MGU Agreement, the cancellation of reinsurance authorized Standard Security to terminate the MGU Agreement immediately.  (Lynn Decl. Ex. E.)  Nevertheless, Standard Security terminated the

MGU.  This is to confirm I do not have a problem with him making this application."  (Lynn Decl. Ex. M.)  Bartfield sent a similar e-mail to Standard Security on September 9, 2003, with a copy to Murphy, stating:  "Jim has requested that I write a reciprocal e-mail concerning his possible application to [Standard Security] for appointment as an MGU.  *I am therefore confirming that I do not have a problem with him making such an application to [Standard Security]*."  (Lynn Decl. Ex. N [emphasis added].)

By letter dated September 12, 2003, Mr. Kettig acknowledged receipt of Bartfield's and Murphy's applications to become new, separate MGUs of Standard Security, and confirmed that neither of them had any objection to the other's applications.  Mr. Kettig also recommended that the two of them mediate their disputes and continue to do business through CFE.  (Lynn Decl. Ex. O.)

By letter dated September 15, 2003, Bartfield declined Kettig's recommendation of mediation and rejected any possibility of continuing CFE's business with Murphy:

> David, I respect and appreciate your recommendations concerning the continuation of CFE Management LLC and/or mediation. However, the consensus of our going-forward team[3] is that there have been too many unpleasant sentiments expressed to allow any of us to reasonably foresee a continuation of the current partnership with Jim beyond the run-out.  The feeling is that the community of interest, which hopefully exists with respect to the run-out, is not strong enough to support the necessary mutual respect for future business.

(Lynn Decl. Ex. P.)  Bartfield also acknowledged that Murphy would be forming a new MGU business, noting that CFE's producers "will be advised that they can elect to submit renewal and new 2004 business to either Jim's new business, our new Company or both and we will be

---

Agreement on 90 days written notice, as it was also authorized to do.  (*Id.* § X.B.)
3 The "going forward team" refers to Bartfield and two CFE employees, Michael McDonald and Lawton Cheney.

guided by their preferences." (*Id.*)  As Bartfield testified at his deposition, "***the producers are free to submit their quotes to whomever they wish and CFE can't dictate to them to whom they should submit quotes.***"  (Bartfield Dep. at 311-12 [Lynn Decl. Ex. U] (emphasis added).)

At that point, however, Standard Security was not interested in discussing future business with either Bartfield or Murphy until the lengthy backlog on the existing business was processed. As Ms. Lipari testified, "I wasn't happy about the situation…. [B]oth of them wanted to discuss going forward and I wanted to discuss the claims.  So I really did not want to discuss anything going forward until the situation was resolved.  That was my primary responsibility."  (Lipari Dep. at 65-66 [Lynn Decl. Ex. W].)  Ms. Lipari's opinion "was that they needed to focus on the runout of Standard Security's business and I wasn't very open to either one of them being an MGU, either separately or together, at this point." (*Id.* at 91-92.)  Accordingly, Standard Security determined that it would not appoint either Bartfield or Murphy as an MGU in the Fall of 2003.  (Kettig Dep. at 80, 93-96 [Lynn Decl. Ex. V].)

   5.   **The Run-Out**

In September and October 2003, Standard Security received a number of calls from policyholders and producers that their claims had not been processed by CFE.  (Lipari Dep. at 45-46, 56 [Lynn Decl. Ex. W].)  The two major complainers were American Stop Loss and North American Health Plans – two of CFE's biggest producers. (*Id.* at 59, 97-98.)  As Ms. Lipari testified:

---

(Bartfield Dep. at 310-11 [Lynn Decl. Ex. U].)

> The claims were not paid.  Their paperwork was submitted, whether it was complete or incomplete, and no action was taken for months.  The files were a mess.  They were all over the place.  It was hard to get paperwork.  I had to request paperwork again from the TPAs [third-party administrators].  Policies weren't issued, so I couldn't tell what benefits were payable.
>
> It was beyond description.

(*Id.* at 57-58.)

Ms. Lipari estimated the backlog of work at the time to be four to six months.  (*Id.* at 60-61.)  Accordingly, for a period of six or seven months beginning in or about September 2003 until March 2004, Ms. Lipari visited CFE's offices several times a week, every week, in order to review the claims and get them paid and processed.  (*Id.* at 55-62.)

Murphy continued to go to CFE's offices every day to process the claims and manage the runout of the business that CFE had written.  (Murphy Dep. at 85-86, 112-13, 169-70, 194-96 [Lynn Decl. Ex. X].)  Following his initial request for an MGU application from Standard Security in early September 2003, which was not granted, there is no evidence that Murphy pursued becoming an MGU with Standard Security or anyone else until April or May 2004.  Rather, the evidence shows that Murphy focused his efforts on rectifying the problems that existed with CFE's claims administration and managing the runout.  (*Id.*)  Murphy continued to manage the runout of CFE's business through its completion, generating more than $2 million in revenues to CFE from December 1, 2003 to December 31, 2006.

### 6. <u>Bartfield's Efforts to Start a New Business</u>

The evidence shows that beginning in September 2003 and continuing through the middle of 2004, Bartfield spent a great deal of time attempting to get his new business started, first with Standard Security and then with a number of other carriers, reinsurers and other

entities.  The record reveals that Bartfield spent virtually no time after November 2003 on the runout of CFE's business.  Indeed, Ms. Lipari, who was going to CFE's offices three times a week until approximately March 2004 to deal with the claims issues, testified that she did not see or speak to Bartfield after the Fall of 2003.  (Lipari Dep. at 68-69 [Lynn Decl. Ex. W].)

In September 2003, Bartfield requested appointment as a Standard Security MGU (Lynn Decl. Exs. K and P).  When Bartfield sought to discuss his request with Ms. Lipari while she was at CFE's office attending to the claims issues, she "told him that we had to finish the claims runoff of Standard Security's business and then that was something that he could address later on, but not until he performed the duties of the MGU agreement with respect to the business that was in force."  (Lipari Dep. at 72; 67-68 [Lynn Decl. Ex. W].)

Although he did not have any authority to bind new business for Standard Security, Bartfield continued to talk with CFE's producers about 2004 business.  He sent Standard Security's 2004 rate information to certain CFE producers (Lynn Decl. Exs. R and S) and renewal quotes without Standard Security's name on it to others (Lipari Dep. at 78-79 [Lynn Decl. Ex. W]).  At his deposition, Bartfield confirmed that he sent that information to solicit business for the new facility that he hoped to get started, and not CFE.  (Bartfield Dep. at 472-77 [Lynn Decl. Ex. U].)

On October 6, 2003, Bartfield caused Gotham Management LLC ("Gotham") to be organized as a New York limited liability company.  (Lynn Aff. Ex. Q.)  Between October 2003 and the middle of 2004, Bartfield worked with McDonald and Cheney (two of CFE's five employees in October 2003) in attempting to get an MGU agreement for his new company.  (Bartfield Dep. at 199-200 [Lynn Decl. Ex. U].)

Gotham retained a business broker and put together a marketing plan for distribution to various carriers, reinsurers, MGUs and others in the medical stop loss insurance field.  The marketing plan was based largely on historical CFE performance data, and noted that ***"[d]ue to differences between its two partners, CFE decided to cease its underwriting activities.*** "  (Lynn Decl. Ex. T [emphasis added].).  The marketing plan further noted that "[w]hile Gotham cannot assure the renewal of current employer stop loss policies written with Standard Security, ***it has been in communications with almost all of the producers*** and is confident that the principal sources of business will continue to offer us the opportunity to quote on their employer stop loss business."  (*Id.* [emphasis added].)  Bartfield confirmed that he spoke with the following CFE producers about Gotham:  American Stop Loss, North American Administrators, Integrity, Integrated Insurance and others.  (Bartfield Dep. at 439-41 [Lynn Decl. Ex. U].)

In October and November 2003, Bartfield continued to seek an MGU Agreement with Standard Security; he also spoke to Arch Insurance Company about becoming an MGU at that time.  (*Id.* at 414-15.)  During that same time period, he met with an MGU called Novia in Indiana to arrange to have Gotham appointed a sub-MGU of Novia.  (*Id.* at 415-19.)  Later that year and into 2004, Bartfield met with Fidelity Security, an insurance company, about becoming an MGU for them, and with a number of reinsurers and related entities – Transatlantic Reinsurance, Folks America and Ace Reinsurance – to secure reinsurance for that potential deal.  (*Id.* at 427-34.)  In January and February, he met with IAT, another MGU in Tennessee, and Excess Reinsurance.  (*Id.* at 434-37.)

Beginning in or about November 2003, Bartfield stopped going to CFE's offices on a regular basis; in December 2003, he went in only on weekends or nights for very short periods of

time (*Id.* at 442); he gradually stopped going to CFE's offices altogether; and in August 2004, he moved to Florida.  (*Id.* at 412-13.)

### 7.     <u>The 2004 Agreement Between Standard Security and Murphy Associates</u>

Like Bartfield, Murphy informed Standard Security in September 2003 that he was interested in becoming an MGU going forward.  As it told Bartfield, Standard Security also told Murphy that it was too early to consider new business until the run-out was brought under control.  Murphy continued to focus on managing the run-out.  Apparently satisfied with Murphy's commitment to the business, Standard Security appointed Murphy's new entity, J.B. Murphy Associates, to act as a managing general underwriter for medical stop loss insurance effective as of May 1, 2004.  (Murphy Dep. at 198, 247 [Lynn Decl. Ex. X].)

## <u>ARGUMENT</u>

## THE AMENDED COMPLAINT SHOULD BE<br><u>DISMISSED AS A MATTER OF LAW</u>

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

The moving party is required to demonstrate that no genuine issue exists as to any material fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-25, (1986).  If the moving party makes such a showing, the "non-movant may defeat summary judgment only by producing specific facts showing that there is a genuine issue of material fact for trial."  *Samuels v. Mockry,* 77 F.3d 34, 36 (2d Cir.1996); *Celotex,* 477 U.S. at 322-23.

An alleged factual dispute between the parties will not by itself defeat a motion for summary judgment.  "By its very terms, [Rule 56(c)] provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of material fact."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986) (emphasis in original). Specifically, the non-moving party may not rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial.  *Anderson*, 477 U.S. at 256-57.

Here, there is no genuine issue of material fact concerning Bartfield's claims. Accordingly, Murphy and Murphy Associates are entitled to summary judgment dismissing the Amended Complaint.

## <u>POINT I</u>

## <u>MURPHY DID NOT BREACH ANY DUTY TO BARTFIELD</u>

Under New York law, a breach of fiduciary duty claim comprises three elements:  (1) the existence of a fiduciary relationship; (2) knowing breach of a duty that relationship imposes; and (3) damages caused by the breach.  *Nay v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 2006 WL 2109467, *6 (S.D.N.Y. Jul. 25, 2006); *Carruthers v. Flaum,* 388 F. Supp. 2d 360, 381 (S.D.N.Y. 2005).  *See also Colotone Liquidating Trust v. Bankers Trust New York Corp.* 243 B.R. 620, 622 (S.D.N.Y. 2000) (granting motion to dismiss, holding that "[i]n order to recover for fraud or breach of fiduciary duty, a plaintiff must establish not only the misconduct complained of, but injury flowing from that misconduct").

The Amended Complaint alleges that in or about September 2003, Murphy entered upon a scheme and a plan to deprive Bartfield of any interest in CFE's "Book of Business." (Amended Complaint ¶ 30 [Lynn Decl. Ex. A].)  The "Book of Business" is defined as "medical stop loss insurance policies issued by CFE on behalf of Standard" (*Id.* ¶ 23.)  The Amended Complaint alleges a series of acts purportedly committed by Murphy "in league with Standard," "each of which independently constitutes a breach of Murphy's fiduciary duty to Bartfield." (*Id.* ¶ 31.)

There is no conspiracy claim in this case, the action against Standard Security was voluntarily dismissed, and there is no evidence that Murphy did anything "in league with Standard Security" during the period in question.  Moreover, a review of the allegations against Murphy reveals a complete lack of evidence that (*i*) Murphy committed the acts alleged, (*ii*) the acts alleged were wrongful or (*iii*) Bartfield was damaged by the alleged acts.

### A.      Bartfield Expressly Agreed to Terminate CFE's Business

A number of the allegations in the Amended Complaint claim that Murphy "induced" Standard Security to terminate the MGU Agreement or otherwise "reached agreement with Standard" Security as part of his "scheme" to deprive Bartfield of his interest in CFE.  (*See* Amended Complaint ¶¶ 31(A)-(E) [Lynn Decl. Ex. A].)  Those allegations ignore a significant fact which undercuts Bartfield's entire case – Bartfield agreed, in multiple writings, to terminate CFE's business.

In September 2003, Bartfield and Murphy jointly advised Standard Security of their decision "to part company and go [their] separate ways.  (Lynn Decl. Ex. F.)  Although Bartfield now claims that he did not wish to terminate CFE at that time, his contemporaneous writings

belie that assertion.  By letter dated September 15, 2003, Bartfield rejected Mr. Kettig's

suggestion that they mediate their disputes "and attempt to continue doing business through CFE

Management LLC" (Lynn Decl. Ex. O), advising that he had no interest in continuing CFE with

Murphy.  (Lynn Decl. Ex. P.)

The joint decision of Bartfield and Murphy to go their separate ways triggered a series of

events, including the cancellation of the reinsurance, which led Standard Security to terminate

the MGU Agreement.  (Lynn Decl. Ex. I.)  Without an MGU Agreement, CFE had no authority

to negotiate or issue medical stop loss insurance policies.  As Bartfield acknowledged at his

deposition, without an insurance company, an MGU has nothing to sell.  (Bartfield Dep. at 38-39

[Lynn Decl. Ex. U].)

There is no evidence that Murphy either consulted or agreed with Standard Security in or

about September 2003 concerning the alleged "Scheme."  (*See* Amended Complaint ¶¶ 31(A)

and (B) [Lynn Decl. Ex. A].)  Murphy testified that he did not discuss the issues that he was

having at CFE with anyone from Standard Security.  (Murphy Dep. at 59-62, 81, 92-95 [Lynn

Decl. Ex. X].)  Neither of the two witnesses from Standard Security testified that Murphy had

discussed those issues with them.[4]  Moreover, there clearly was no agreement in September 2003

between Murphy and Standard Security concerning future business.  Although Murphy had

requested to be authorized as an MGU – as did Bartfield –  Standard Security had determined not

to appoint either of them as an MGU at that time.  (Kettig Dep. at 80, 93-96 [Lynn Decl. Ex. V].)

B.    The MGU Agreement Expressly Permitted Termination by Either Party

---

4 In contrast, Ms. Lipari testified that Bartfield had told her that he and Murphy weren't getting
along and that he was thinking of leaving Murphy.  (Lipari Dep. at 33, 47-52 [Lynn Decl. Ex.
W].)

Standard Security did not need "purported grounds" to terminate the MGU Agreement. (*See* Amended Complaint ¶ 31(D) [Lynn Decl. Ex. A].)  The MGU Agreement authorized either party to terminate the agreement on 90 days written notice – for any reason or for no reason. (MGU Agreement § X.B. [Lynn Decl. Ex. E].)  Moreover, where, as here, the reinsurance had been cancelled, Standard had the right to terminate the MGU Agreement immediately.  (*Id.* § X.B.1.(c).)

Bartfield's position – that Standard's exercise of its contractual right could somehow subject it to liability if Bartfield were unable to secure another MGU – would render the termination provisions of the MGU Agreement meaningless.  Similarly, the attempt to subject Murphy to liability for Standard Security's exercise of its contractual rights is baseless.

### C. Murphy's Formation of a New Business Did Not Constitute a Breach of Fiduciary Duty

A number of allegations in the Amended Complaint claim that Murphy breached his fiduciary duty by organizing Murphy Associates to be an MGU in the medical stop loss insurance field.  (*See* Amended Complaint ¶¶ 31(G)-(K) [Lynn Decl. Ex. A].)  Again, those allegations ignore two significant facts which undercut Bartfield's case – (1) CFE was no longer authorized to write new business and (2) Bartfield agreed that he and Murphy would each start new companies to pursue MGU businesses.

Murphy testified that he organized Murphy Associates in November 2003 as a vehicle to pay certain business expenses of CFE for which Bartfield was refusing to sign checks.[5]  (Murphy Dep. at 296-98, 314 [Lynn Decl. Ex. X].)  Although Murphy Associates was appointed as an MGU by Standard Security in May 2004, that hardly constitutes a breach of fiduciary duty,

given Bartfield's repeated written representations to Standard Security that (1) he and Murphy had decided to part company and go their separate ways (Lynn Decl. Ex. F), (2) he had no problem with Murphy applying to be an MGU of Standard Security (Lynn Decl. Ex. N), and (3) CFE's producers were free to submit renewal and new 2004 business to Murphy's new business, Bartfield's new company, or both (Lynn Decl. Ex. P).

Once he was back in business in May 2004, Murphy contacted a number of the producers that he had dealt with at CFE (and, before that, at RMTS), and asked for the opportunity to quote on their business. (Murphy Dep. at 301-10, 359-61, 374-75 [Lynn Decl. Ex. X].) Indeed, Murphy knew many of those producers for many years. (*Id.* at 344, 349-50, 371-72.) But there was nothing wrongful in that – he was simply doing (1) what he and Bartfield had agreed they were each free to do, (2) what Bartfield had been doing since October 2003 (even though he had no authority from an insurer), and (3) what he and Bartfield had done when they started CFE. As Bartfield noted in his affidavit in the RMTS litigation:

> Since it began operations last November, CFE has requested most of [RMTS's] producers to provide CFE the opportunity to quote on whatever medical stop loss insurance they are to seek on behalf of their self-insured groups. It does not matter to CFE whether such groups have been previously insured by [RMTS's] insurance carriers] or another insurance company. The personal relationship with the producer is the key to getting an opportunity to quote on its cases.

(Bartfield January 17, 2000 Affidavit ¶ 18 [Lynn Decl. Ex. D].) Moreover, as Bartfield testified in this case, "***the producers are free to submit their quotes to whomever they wish and CFE can't dictate to them to whom they should submit quotes.***" (Bartfield Dep. at 311-12 [Lynn Decl. Ex. U] (emphasis added).

---

5 Murphy and Bartfield had agreed that all checks from CFE would require the signatures of both of them.

There is no evidence that Murphy caused any business to move to Standard.  (*See* Amended Complaint ¶ 31(J) [Lynn Decl. Ex. A].)  Once CFE was no longer authorized to quote business, one of CFE's largest producers approached Standard Security and asked that Standard Security quote renewal business internally.  (Kettig Dep. at 80-89 [Lynn Decl. Ex. V].)  Moreover, according to Bartfield, Mr. Kettig had advised that Standard Security was required under Insurance Department regulations to provide its customers with renewal quotes, and CFE was not authorized to provide them.  (Bartfield Dep. at 351-55, 419-21 [Lynn Decl. Ex. U].)

As CFE was not authorized to write any new business, there was no business to divert.  (*See* Amended Complaint ¶ 31(K) [Lynn Decl. Ex. A].)  Bartfield does not allege that the runout of CFE's business, which was completed in CFE's New York City offices in December 2006, and which required space, office equipment, telephones and employees, constituted diversion.  Thus, Bartfield was not damaged by Murphy's use of CFE's facilities.

### D. Murphy Did Not – and Could Not – Exclude Bartfield from the Management of CFE

Murphy did not assume control of CFE and exclude Bartfield from its management.  (*See* Amended Complaint ¶ 31(L) [Lynn Decl. Ex. A].)  In any event, as Bartfield and Murphy each own 50% of the Company, and as all CFE checks require the signatures of both of them (Amended Complaint ¶ 17 [*Id.*]), Murphy would have been unable to assume control and exclude Bartfield.  In fact, Murphy timely provided Bartfield with information concerning the winding up of CFE's business, and he directed that all CFE revenues be deposited into CFE's bank accounts, to which Bartfield has had the same access as Murphy at all times.

Although the reasons why are disputed by the parties, beginning in or about November 2003, Bartfield stopped coming to CFE's office.  The contemporaneous record shows that

starting in late 2003 and thereafter, Bartfield concentrated his efforts on his new business, not CFE.  In August 2004, Bartfield moved to Florida.  (Bartfield Dep. at 412 [Lynn Decl. Ex. U].)

Notwithstanding his present complaints that Murphy excluded him from the Company, Bartfield never sought any type of court-ordered emergency relief in 2003 or 2004 to assert his rights.  Rather, he waited years before bringing this action, after Murphy had completed the runout of CFE's business and had been in business for himself for several years.

Significantly, Bartfield does not claim to have been damaged by anything that Murphy did in connection with the runout of CFE's business written in 2000, 2001, 2002 and 2003 – the only real "Book of Business" belonging to CFE.  Indeed, at this time, CFE continues to have approximately $1.2 million on deposit which cannot be distributed until this matter (including Murphy's counterclaims, which are not the subject of this motion) is resolved.  Instead, Bartfield claims some entitlement to Murphy's new business, without basis in law or fact.

## POINT II

### NEITHER BARTFIELD NOR MURPHY HAS ANY ACTIONABLE INTEREST IN CFE'S SO-CALLED BOOK OF BUSINESS

Bartfield's entire case is predicated on the fiction that, as the owner of a 50% membership interest in CFE, he has an interest in the specific property allegedly comprising CFE's "Book of Business."  As a matter of law, however, to the extent that CFE had such a "Book of Business," neither Bartfield nor Murphy had any interest in it.

New York's Limited Liability Company Law provides, in pertinent part, that:

> A membership interest in the limited liability company is personal property.  ***A member has no interest in specific property of the limited liability company.***

20

LLCL § 601 (emphasis added).  Thus, "it is the LLC which owns all of the assets and not the individual members pro rata.  This is in marked contrast to the property ownership rules under traditional partnership law, which give partners ownership in the entity's property by creating a 'tenancy in partnership.'"  B. Schorr, *New York Limited Liability Companies & Partnerships* § 601 (2000) (Lynn Decl. Ex. Y).

Accordingly, Bartfield's claims seeking a *pro rata* interest in the specific property comprising CFE's alleged "Book of Business" or its alleged "Benefits" (*see* Amended Complaint ¶ 24) – such as the requests for a constructive trust – should be dismissed.  LLCL § 601.

### POINT III

### MURPHY AND MURPHY ASSOCIATES WERE NOT UNJUSTLY ENRICHED

To recover on an unjust enrichment claim under New York law, the plaintiff must prove that "(1) the defendant was enriched; (2) enrichment was at the plaintiff's expense; and (3) the defendant's retention of the benefit would be unjust*." Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 49 F.Supp.2d 298, 301 (S.D.N.Y. 1999) (citation omitted) (granting summary judgment dismissing unjust enrichment claim).  "The third element is satisfied when the circumstances are such 'that equity and good conscience require defendant to make restitution.'"  *Id.* (citation omitted).

The unjust enrichment claims against Murphy and Murphy Associates seek a portion of the monies received on new business written by Murphy beginning in May 2004 (and continuing, presumably, to the present).  (*See* Amended Complaint ¶¶ 37-45 and 58-66 [Lynn Decl. Ex. A].) For the same reasons that Bartfield's breach of fiduciary duty claim fails, his

unjust enrichment claims must fail:  he agreed with Murphy to terminate CFE's business, he agreed that Murphy could pursue an MGU arrangement with Standard Security, and he agreed that Murphy's new business would be free to solicit business from the producers of CFE's business.  Assuming, *arguendo*, that Murphy being compensated for performing services for J.B. Murphy Associates some eight months after he and Bartfield agreed to terminate CFE's business can constitute "enrichment," Bartfield cannot satisfy the second two elements, that such enrichment was at Bartfield's expense or that Murphy's retention of the benefit would be unjust.  Accordingly, defendants are entitled to summary judgment dismissing the unjust enrichment claims.

## POINT IV

### MURPHY ASSOCIATES DID NOT
### AID AND ABET ANY BREACH OF FIDUCIARY DUTY

Under New York law, a claim for aiding and abetting a breach of fiduciary duty requires (1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach and (3) that the plaintiff suffered damage as a result of the breach.  *In re Sharp Int'l Corp.*, 403 F.3d 43, 49 (2d Cir. 2005); *Kaufman v. Cohen,* 307 A.D.2d 113, 125, 760 N.Y.S.2d 157, 169 (1st Dep't 2003).

As set forth in Point I above, Murphy did not breach any duty to Bartfield, and Bartfield cannot show that he has suffered any damages from Murphy's conduct.  Accordingly, Bartfield's claim against Murphy Associates for aiding and abetting a breach of fiduciary duty (*see* Amended Complaint ¶¶ 46-57) should be dismissed as a matter of law.

## POINT V

## BARTFIELD SHOULD BE ESTOPPED FROM ASSERTING
## THE CLAIMS SET FORTH IN THE AMENDED COMPLAINT

### A.    The Amended Complaint Is Barred by the Doctrine of Judicial Estoppel

Judicial estoppel, also known as the doctrine of estoppel against inconsistent positions,

precludes a party from taking a position in a legal proceeding that is contrary to a position

previously taken by that party in a prior legal proceeding.  *Mitchell v. Washingtonville Central*

*School District*, 190 F.3d 1, 6 (2d Cir. 1999).  Thus, "where a party assumes a certain position in

a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply

because his interests have changed, assume a contrary position."  *Environmental Concern, Inc. v.*

*Larchwood Construction Corp.*, 101 A.D.2d 591, 593, 476 N.Y.S.2d 175, 177 (2d Dep't 1984),

*quoting Davis v. Wakelee*, 156 U.S. 680, 689 (1895).  "A party invoking judicial estoppel must

show that (1) the party against whom estoppel is asserted took an inconsistent position in a prior

proceeding and (2) that position was adopted by the first tribunal in some manner."  *Mitchell v.*

*Washingtonville Central School District*, 190 F.3d at 6 (citation omitted).

In the action brought by RMTS against Bartfield, Murphy and CFE, RMTS alleged, *inter*

*alia*, that Bartfield and Murphy breached their fiduciary duties by soliciting business on behalf of

CFE from producers with whom they had dealt at RMTS.  Bartfield and Murphy took the

position in that case that they were free to contact those producers on behalf of CFE once they

were no longer writing business on behalf of RMTS.  The New York Supreme Court adopted

that position and dismissed the claims against Bartfield, Murphy and CFE.  *See Bartfield v.*

*RMTS Associates, LLC*, 11 A.D.3d 386, 387, 783 N.Y.S.2d 560, 561 (1st Dep't 2004).

In this action, simply because his interests have changed, Bartfield claims that Murphy breached of his fiduciary duty by contacting producers on behalf of J.B. Murphy Associates after CFE was no longer authorized to write business.  Bartfield should be estopped from taking that inconsistent position here.

### B.      The Amended Complaint Is Barred by the Doctrine of Equitable Estoppel

The purpose of equitable estoppel is to preclude a person from asserting a right after having led another to form the reasonable belief that the right would not be asserted, and loss or prejudice to the other would result if the right were asserted.  *Shondel J. v. Mark D.*, 7 N.Y.3d 320, 326, 820 N.Y.S.2d 199, 202 (2006); *see also In re Ionosphere Clubs, Inc.*, 85 F.3d 992, 999 (2d Cir. 1996) (doctrine is "imposed by law in the interest of fairness to prevent the enforcement of rights which would work fraud or injustice upon the person against whom enforcement is sought and who, in justifiable reliance upon the opposing party's words or conduct, has been misled into acting upon the belief that such enforcement would not be sought").

Bartfield and Murphy agreed in September 2003 that each could separately apply to Standard Security to serve as MGUs.  Both did exactly that, without objection from the other. Murphy relied on Bartfield's consent to his pursuit of Standard Security's business, and this action constitutes a complete reversal of Bartfield's earlier position. The fact that Bartfield sought the *exact same business* only underscores the essential hypocrisy of this action.

24

## **<u>Conclusion</u>**

For all of the foregoing reasons, Murphy and Murphy Associates respectfully request that

the Court grant their motion for summary judgment and dismiss all of the claims against them in

this action.

Dated:  New York, New York
      January 30, 2008                               _____s/_____
                                                   James P. Lynn (JL 8441)

                                        LYNN & CAHILL LLP
                                        500 Fifth Avenue, 14th Floor
                                        New York, New York 10110
                                        (212) 719-4400

                                        Attorneys for Defendants James B. Murphy
                                           and J.B. Murphy Associates LLC