UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x  06 cv 6435 (RJH)(HP)

JOSEPH BARTFIELD,                          : ECF CASE

        Plaintiff,                       :

    -versus-                                :

JAMES B. MURPHY, J. B. MURPHY             :
ASSOCIATES LLC, STANDARD SECURITY
LIFE INSURANCE COMPANY OF NEW YORK        :
and CFE MANAGEMENT LLC,

                       :

        Defendants.                      :
- - - - - - - - - - - - - - - - - -x


PLAINTIFF'S MEMORANDUM IN OPPOSITION
TO SUMMARY JUDGMENT


John M. Burns, III
  Attorney for Plaintiff
33 Greenwich Avenue
New York, New York 10014
(212) 360-199011

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................... 1

STATEMENT ........................................................ 3

ARGUMENT ........................................................ 16

    I.    MURPHY BREACHED HIS
           FIDUCIARY DUTY TO BARTFIELD ......................... 16

    II.  MURPHY AND ASSOCIATES
           WERE UNJUSTLY ENRICHED ............................. 22

    III. ASSOCIATES AIDED AND
           ABETTED MURPHY'S BREACH ............................ 22

    IV.  DEFENDANTS' ARGUMENTS FOR
           ESTOPPAL ARE FECKLESS ............................. 23

    V.   DEFENDANTS RAISE IRRELEVANT CONCERNS ................ 24

CONCLUSION ...................................................... 25

## TABLE OF AUTHORITIES

<u>CASES</u>

<u>Bridgeway Corporation</u> v. <u>Citibank</u>,
    201 F.3d 134 (2d Cir. 2000) .............................. 3

<u>Drucker</u> v. <u>Mige Assoc. II</u>, 225 A.D.2d 427,
    639 N.Y.S.2d 365 (1st Dep't),
    <u>lv. denied</u>, 88 N.Y.S2d 807 (1996) ..................... 18, 20

<u>First Investors Corp.</u> v. <u>Liberty Mutual</u>
    <u>Insurance Co.</u>, 152 F.3d 162 (2d Cir. 1998) ............... 3

<u>Lio</u> v. <u>Zhong</u>, 10 M.3d 1068,
    814 N.Y.S.2d 562 (S.Ct.N.Y.Co, 2006) .................... 17

<u>Lowenschuss</u> v. <u>Kane</u>, 520 F.2d 255 (2nd Cir. 1975) ............. 3

<u>Nathanson</u> v. <u>Nathanson</u>, 20 A.D.3d 403,
    799 N.Y.S.2d 83 (2d Dep't 2005) .......................... 17

<u>New England Health Care Union</u> v. <u>Mount Sinai Hospital</u>, 65 F.3D
1024 (2d Cir. 1995) ............................................ 3

<u>Salm</u> v. <u>Feldstein</u>,  20 A.D.3d 469, 470,
    799 N.Y.S.2d 104, 105 (2d Dep't 2005) .................... 17

<u>Out of the Box Promotions LLC</u> v.
    <u>Koschitzki</u>, 15 M.3d 1134,
    841 N.Y.S.2d 821, (S.Ct.Kings Co. 2007) .................. 20

<u>Richbell Information Services, Inc.</u>
    v. <u>Jupiter Partners, L.P.</u>, 309 A.D.2d 288,
    765 N.Y.S.2d 575 (1st Dep't 2003) ........................ 21

<u>TIC Holdings, LLC</u> v. <u>HR Software</u>
    <u>Acquisition Group, Inc.</u>, 194 Misc.2d 106,
    750 N.Y.S.2d 425 (S.Ct.N.Y.Co. 2002),
    <u>aff'd</u> 301 A.D.2d 414 (1st Dept 2003) .................. 17-18

<u>Tzolis</u> v. <u>Wolff</u>, 39 A.D.3d 138,
    829 N.Y.S.2d 488, <u>aff'd</u> ___ N.Y.2d ___ (2008) ........... 17

<u>Willoughby</u> v. <u>Webster</u>, 13 M.3d 1230,
    831 N.Y.S.2d 357 (S.Ct. Nassau Co. 2006),
    <u>aff'd</u>, ___ A.D.3d ___ (2d Dep't 2007) .................... 21

Zulawski v. Taylor, 11 M.2d 1058,
      815 N.Y.S.2d 496 (S.Ct. Erie Co. 2005)......................17

**STATUTE**

LLCL §609(a) ....................................................17

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x  06 cv 6435 (RJH)(HP)

JOSEPH BARTFIELD,               :  ECF CASE

            Plaintiff,          :

        -versus-               :

JAMES B. MURPHY, J. B. MURPHY   :
ASSOCIATES LLC, STANDARD SECURITY
LIFE INSURANCE COMPANY OF NEW YORK :
and CFE MANAGEMENT LLC,

            Defendants.         :
- - - - - - - - - - - - - - - - - -x
```

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO SUMMARY JUDGMENT

PRELIMINARY STATEMENT

This memorandum is submitted by plaintiff Joseph Bartfield ("Bartfield") in opposition to the motion for summary judgment by defendants James B. Murphy ("Murphy") and Murphy's wholly owned, Declaration of John M. Burns, III dated March 31, 2008 ("Burns Dec.") ¶ 2.W., J. B. Murphy Associates LLC ("Associates").

In this diversity action, Bartfield seeks (a) his remedy for Murphy's breach of his fiduciary duty to Bartfield, aided and abetted by Associates, and the unjust enrichment of each at Bartfield's expense through declaratory judgment, relief under 28 U.S.C. 2202, accountings and constructive trust, and (b) punitive damages.

Murphy's fiduciary duty arose out of Bartfield's and Murphy's investment of time and money in their joint ownership (50% each) and successful operation of CFE Management LLC

("CFE"), impelling CFE to remarkable success marketing and administering one year medical stop loss insurance policies.  The tort included:

> A.  Murphy's deliberate unjustified termination of Bartfield's right and interest in CFE's renewal opportunities;

> B.  Murphy's deliberate frustration of Bartfield's efforts to salvage those renewal opportunities;

> D.  Murphy's use of coercion to exclude Bartfield from administering the "run-out" of CFE's existing policies; and

> E.  Murphy's use of "run-out" administration and CFE's other assets to divert renewals to Associates.

Strangely on this motion, defendants choose to ignore Murphy's fiduciary duty and Murphy's multiple breaches of that duty.  Instead, defendants try to re-frame the issues as contract disputes, where no contract is applicable, and Bartfield's efforts to salvage his interest (or mitigate his injury), but without addressing Murphy's role in thwarting Bartfield's efforts to salvage his interest or mitigate his injury.

Thus, undisputed facts and unaddressed issues of fact relating to Murphy's fiduciary duty and his repeated breaches of that duty bar judgment in defendants' favor against Bartfield.

Undisputed facts recited in Bartfield's "Statement" hereinafter should be determined under F.R.Civ.P. Rule 56(d)(1)

2

to be "not genuinely at issue"; on such determination, the Court should search the record and <u>sua sponte</u>[1]

    (a)  determine and declare Bartfield's right and interest in the renewals and the diverted business,

    (b)  grant Bartfield the accountings requested, and

    (c)  pursuant to 28 U.S.C. § 2202, award judgment to Bartfield in the amounts which he should have realized.

STATEMENT

Murphy and Bartfield each gained years of experience through RMTS Associates and its affiliated RMTS Associates LLC ("RMTS"), a New York managing general underwriter ("MGU"), in marketing, issuing and administering one year medical stop loss insurance policies for insurance carriers. Bartfield's Declaration dated March 30, 2008 ("Bart Dec.") ¶ 3.

At the end of August, 1999 Bartfield left RMTS.  On November 9, 1999 Murphy left RMTS and joined Bartfield to form CFE Management, LLC ("CFE") to act as an MGU for similar insurance policies.  On November 10, 1999, CFE entered into a written agreement to act as MGU for two Highmark insurance companies. Bart Dec. ¶ 4.

---

[1]    <u>See</u>, <u>e.g.</u>, <u>Bridgeway Corporation</u> v. <u>Citibank</u>, 201 F.3d 134 (2d Cir. 2000); <u>First Investors Corp.</u> v. <u>Liberty Mutual Insurance Co.</u>, 152 F.3d 162 (2d Cir. 1998); <u>New England Health Care Union</u> v. <u>Mount Sinai Hospital</u>, 65 F.3D 1024 (2d Cir. 1995); <u>Lowenschuss</u> v. <u>Kane</u>, 520 F.2d 255 (2nd Cir. 1975).

3

Murphy and Bartfield contributed equally to CFE's capital; each invested his full working time to the business of CFE and at all times each owned 50% of CFE. Bart Dec. ¶ 6.

CFE's February 8, 2000 operating agreement, _inter_ _alia_, "vested ["[m]anagement"] "in all the Members", ¶7, permitted voluntary withdrawal, ¶8, and required distributions of "all cash" of CFE "not required for the operation or reasonable working capital requirements". ¶10.  Respecting termination the agreement referred generally to dissolution under New York's Limited Liability Company Law. Bart ¶ 7 and Ex. 1.

Over time CFE's personnel expanded to include two underwriters, Michael McDonald and Lawton Cheney, in addition to Murphy and Bartfield, and Brian Murphy, Murphy's nephew, as an underwriter in training, and two clerical workers. Bart Dec. ¶ 8.

Throughout CFE's history the underwriters worked in a single room; each knew what the others were doing.  Each could work interchangeably on every account. Bart Dec. ¶ 9, Burns Dec. ¶ 2.A.

Effective May 1, 2000 CFE replaced Highmark with Standard Security Life Insurance Co. of New York ("Standard") as its carrier. Bart Dec. ¶ 10.

CFE's May 1, 2000 agreement with Standard, Lynn Dec. Ex. E, as concurrently amended, Bart Dec. Ex. 2,, _inter_ _alia_, (a) specified CFE's compensation as 9.5% of premium plus 35% profit

share as defined, (b) required both Bartfield and Murphy to continue as active members of CFE and (c) empowered either party to terminate the agreement on 90 days notice.

CFE provided fair and efficient administration; hence, renewals were high, averaging 68.8% during the 2 1/2 years of the CFE-Standard Agreement.  Consumer satisfaction and knowledge of policy expiration dates gave an underwriter an obvious advantage in renewing a policy. Bart Dec. ¶ 11; Burns Dec. ¶ 2.B.

From January, 2000 through September, 2003, CFE's total business revenues were $8,675,527. Bart Dec. ¶ 12.  Murphy was pleased with CFE's premium growth. Burns Dec. ¶ 2.C.  Standard regularly raised the "cap" on CFE's premium writing authority. Bart Dec. ¶ 13.

CFE's operating expenses, including depreciation and franchise taxes, from 2000 through 2003 totaled $3,071,210. Bart Dec. ¶ 12.  $632,935 of expenses paid from 2004 through 2006 but allocable to pre-2004 revenues would have been absorbed by future operations. Bart Dec. ¶ 12, fn.3.

If CFE's "business had continued to be written throughout 2003 and beyond", the value of CFE's book of business at December 31, 2003, assuming the usual rate of renewals and new business, was $6,901,591. Burns Dec. ¶ 3 and Ex. 1, pp. 1 and 7.

In late August 2003, Burns Dec. ¶ 2.E and J; Bart Dec. ¶ 14, Murphy asked Bartfield to join him in CFE's conference room where

5

the two owners held their private conversations.  Bartfield assumed the topic would include CFE's strategies for January 1, 2004 business.  2003 policy writing was largely completed and underwriters were turning their attention to January 1, 2004, when 40% of CFE's renewal and new policies customarily became effective; writing those policies would occupy the remainder of 2003. Bart Dec. ¶ 14; Burns Dec., ¶¶ 2.H and I.

Bartfield's expectation was wrong.  Murphy intended to tell Bartfield that Murphy was terminating CFE.  Based on a gut reaction, Burns Dec. ¶ 2.K, and without reviewing Bartfield's underwriting, Burns Dec. ¶ 2.L, Murphy claims that he had concluded that Bartfield was not paying attention to CFE and that in late August Murphy had unilaterally decided to bring CFE's business to an end without advance notice. Burns Dec. ¶ 2.J.

Murphy left unanswered the obvious question why, since he had unbridled authority to impose review requirements on all outgoing CFE proposals and actually imposed such requirements after terminating CFE's business, Burns Dec. ¶ 2.N, Murphy chose the more drastic step of terminating CFE's business.

In the late August conference room meeting, Murphy precluded negotiation; he told Bartfield "we were going to terminate the affairs of CFE Management." Bart Dec. ¶ 15; Burns Dec. ¶¶ 2.D and J.  At first, Bartfield assumed Murphy was walking away from CFE, Bart Dec ¶ 16, but Murphy had no intention that he be the one to

6

walk away. Burns Dec, ¶ 2.P

Bartfield was obviously "quite shocked". Burns Dec. ¶ 2.D. As Murphy testified, "I'm sure it was a surprise to Joe and the staff that I [Freudian slip?] was going to -- that we were going to terminate the business." Burns Dec. ¶ 2.G.

Murphy wanted Bartfield immediately to sign a joint letter to Standard notifying Standard of CFE's termination. Bart Dec. ¶ 16.

With time to prepare and at a different time of year, Bartfield likely could have salvaged CFE's renewal business. Bart Dec. ¶ 17.  At worst, they could have sold the business to another MGU.  When Bartfield begged for time Murphy refused, threatening to put CFE out of business immediately unless Bartfield signed the proposed joint letter. Bart Dec. ¶ 18.

Murphy was inordinately proud of his status as a medical stop loss insurance underwriter, Burns Dec. ¶ 2.P; Bartfield perceptively surmised that Murphy would not have broken up CFE without having some prior comfort from Standard.  Within days his surmise was confirmed when Bartfield learned from "Bob" Tsourides, Standard's Vice President for Underwriting, that Standard knew of Murphy's plan to break up CFE before he told Bartfield.[2] Tsourides Dec. ¶ 3; Bart Dec. ¶ 19.

---

[2]     While it is not a necessary consideration in
        establishing Murphy's breach of fiduciary duty, it
        appears more likely than not that Murphy obtained some

On Tuesday after Labor Day Murphy demanded an immediate joint letter to Standard, but Bartfield held out for agreement on basic terms of separation before giving notice. Bart Dec. ¶ 20.

With little leverage or choice in view of Murphy's apparent willingness to destroy CFE's business, Murphy's perplexing behavior and his power to veto provided to "all the Members" by CFE's Operating Agreement, ¶ 7, over three days Bartfield hammered out a basic separation understanding, with Murphy threatening physical harm to Bartfield and his family if Bartfield did not agree to sign a letter to Standard[3] and

_____

comfort level from Standard before he terminated CFE. Such arrangement would not be bruited about or disclosed to Bartfield. Murphy's denial of pre-termination contact with Standard is antithetic to his compulsive instinct to remain an MGU. Burns Dec ¶ 2.P; Bartfield's instinct and Mr. Tsourides' inside knowledge rebuts Murphy's denial. Tsourides Dec. ¶ 3. During 2003 Murphy met "[a]s much as once a week, possibly twice a month, but very regularly", Burns Dec. ¶ 2.AB, with Alex Giordano, Standard's "senior vice president -- chief marketing officer". Burns Dec ¶ 4.B. How could Murphy not warn his buddy of the bombshell he intended to lob at Standard's marketing department by terminating CFE? Obviously, these two buddies had worked out a plan. After the September 4 letter Murphy also discussed with various Standard personnel, including Mr. Giordano, the question of what to do with CFE's renewal business. Burns Dec. ¶ 2.AC. From January 1 through April, 2004 Standard parked eleven CFE accounts having total premium of $1,355,306 for Associates. Bart Dec. ¶ 40. On May 1, 2004 Standard let Associates start serving as MGU without even an application for Associates on Standard's form or even a written, signed MGU agreement. Burns Dec. ¶ 2.AD.

[3]    Murphy is 6'9" tall, weighs approximately 295 pounds, was a college athlete and speaks aggressively. Burns

complaining throughout that Bartfield was "blocking him". Bart Dec. ¶ 21.

Murphy's sole "concern was to put a halt to CFE's business * * *." Burns Dec. ¶ 2.Q.   "[W]e were going to terminate the affairs of CFE Management." Burns Dec. ¶ 2.J.

The basic understanding[4] that Murphy and Bartfield eventually agreed to on September 4 was that

> 1.   Bartfield, McDonald and Cheney would form a new MGU (using "CFE" in its name) and assuming CFE's leases to operate from CFE's then offices  using CFE's equipment.
>
> 2.   Murphy and his wife would move out of CFE; Murphy would remain a CFE owner, entitled to participate in the "run-out" of CFE's in force policies, run-out expenses to be contained, run-out records to be available in CFE's space, and each party to keep the other fully informed.

Bart Dec. ¶ 23 and Ex. 3.

Agreement to the basic terms of the separation was reached on Thursday, September 4, 2003. Bart Dec. ¶ 22.  Murphy and

---

Dec. ¶ 2.Z.  Bartfield is 5'5" tall, weighs 175 pounds and claims no athletic prowess. Bart Dec. ¶ 38, fn. 4.

[4]   The understanding was memorialized in Bartfield's email to Murphy sent on September 7, 2003.  Murphy's September 8 email response read in its entirety, "Thank you for putting words to paper.  I will review and get back to you.  Obviously, there is a good deal to consider in all of this."
Bart Dec. Ex. 3.  Murphy proposed no alternative until his bizarre September 19 letter, discussed _infra_.

Bartfield then negotiated the language of the letter to Standard. Bartfield strove successfully to draft a letter that should not trigger termination of the CFE Standard Agreement or impair his ability to salvage what he could from CFE. Bart Dec. ¶ 22.

The resulting letter ,Lynn Dec. Ex. F, alerted Standard to Murphy and Bartfield's "decision" eventually "to part company and go our separate ways", but did not indicate a timetable.  The letter explained that formalities of separation and notification of Standard were being worked out and assured that Murphy and Bartfield would continue to administer the run-out.

The letter was simply an advisory that Murphy and Bartfield had consulted a lawyer about separating, but they obviously were not yet bound to separate; indeed, Standard proved to be of the opinion that they were not bound to separate. Lynn Dec. Ex. O. The letter said nothing about terms of separation, fault or reason, or release or waiver of claims.

A reinsurer, Everest Reinsurance, claimed to rely on the September 4 letter to cancel reinsurance of part of CFE's Book of Business.  Nothing in the Everest-Standard agreement, Burns Dec. ¶ 5 and Ex. 3, empowered Everest to cancel that agreement on the stated basis; obviously with cooperation from Murphy and Standard that termination could have been renegotiated.  On Monday, September 8, 2004 Standard canceled the CFE-Standard Agreement based on the Everest cancellation, barring CFE from writing any

policy with an effective date after December 9, 2003.

Bartfield turned his attention to mitigating his injury. First he had to keep CFE's business vibrant.  By September 10 Bartfield, McDonald and Cheney were authorized to negotiate renewal and new business during 2003 based on Standard's 2003 premium rates and, "at point of sale" submit the proposals to Mr. Tsourides for him to "sign off on the final proposal" for Standard. Bart Dec. ¶ 25 and Ex. 5.

Bartfield sent Standard his business plan, reciting, <u>inter alia</u>, McDonald's and Cheney's commitment to the proposed MGU, and requested appointment as a Standard MGU.  Although Bartfield frequently repeated his request, Standard ignored Bartfield's repeated requests for appointment as MGU. Bart Dec. ¶ 26.

On September 12, 2003 Standard suggested that Murphy and Bartfield mediate their dispute "and attempt to continue doing business through CFE Management LLC or agree on a plan as to new and renewal quotes and run-off of existing business." Lynn Dec. Ex. O.  Despite the bad blood flowing from Murphy's threats, Bartfield approached Murphy to discuss Standard's suggestion. Bart Dec. ¶27.

Murphy claims that both he and Bartfield favored mediation, but it never happened and he cannot remember why not. Burns Dec. ¶ 2.AA.  Bartfield attests that he told Murphy that Standard's offer would afford them time to "work out our arrangement in a

reasonable manner". Bart Dec. ¶ 27.  Murphy, however, screamed, Burns Dec. ¶ 2.Z, that he "didn't want to have anything to do with me, * * * doesn't want to underwrite with me, * * * didn't want to mediate with me." Bart Dec. ¶ 27.  So that Standard would not become concerned about Murphy and Bartfield's ability to cooperate on administering the run-out, Bartfield Dec. ¶ 27, Bartfield simply advised Standard that there did not appear to be enough community of interest to support mediation. Lynn Dec. Ex. P.

On September 17, 2003 Bartfield submitted a draft plan to Murphy and Standard for handling the run-out. Bart Dec. ¶ 28. Instead of discussing the plan on the merits, Murphy, who still had not found time to respond substantively to Bartfield's September 7 email listing separation terms, fired off a letter to Standard writing on the next day, September 18, 2003 that CFE "is at a crisis stage", an "impasse", that Bartfield "has violated my trust" and "continues to act in a manner detrimental to CFE" and asserting that "I am going to pursue dissolution of CFE Management LLC * * *" and "[c]ertainly, I will not approve another renewal or new account from this point forward." Bart Dec. ¶ 28 and Ex. 7.

Starting on September 24, 2003 Murphy notified Bartfield, CFE's staff and the brokers and administrators who had referred CFE's accounts that CFE would no longer issue medical stop loss

policies and insisted that his and Bartfield's signatures be required on all CFE checks.  Bartfield humored him about joint signatures for check signing. Bart Dec ¶¶ 29 and 30 and Ex. 8.

In September 2003 brokers and administrators who had referred CFE's Book of Business started registering concern that their clients' medical stop loss policies would expire on January 1, 2004 with no sure place to go for renewals. Bart Dec. ¶ 31; Burns Dec. ¶ 2.M.   In early October, 2003 Mr. Tsourides gave Bartfield Standard's 2004 rates and permission to use them to issue "rate indications" for policies with January, 2004 effective dates. Bart Dec. ¶ 32.

When it became apparent that Standard was not likely to act soon on his request for MGU appointment, Bartfield applied to another insurance carrier to appoint Gotham as MGU for medical stop loss insurance, but it was already too late to make such arrangements "for a January 1, 2004 start date" and no existing MGU would likely assume possible liability through Bartfield before rights in CFE's Book of Business were determined as between Bartfield, Murphy and Standard. Bart Dec. ¶ 33 and Ex. 4.

At last on September 19, 2003 Murphy responded to Bartfield's September 7 outline of separation terms.  Murphy's proposal parodied conscientious negotiation.  Murphy wanted Bartfield to agree, inter alia, to hold Standard harmless if for whatever reason Standard appointed Murphy, but not Bartfield, as

13

an MGU and, in that event, never to contact any "producer" who had referred any CFE account that renewed on January 1, 2004, no matter how many other accounts were represented by that producer. Bart Dec. ¶ 24 and Ex. 4.

In September or early October, 2003, as the season to write policies effective January 1 commenced, Standard suggested that it amend the December 9 cut-off date so as to permit CFE to renew policies which expired on January 1, 2004.  Murphy rejected any pursuit of this suggestion. Bart Dec. ¶ 34.

In October, 2003 Murphy terminated CFE's employment of Cheney. Bart Dec. Ex. 35.

Advised by contacts in the industry that other existing MGUs for Standard would contract to hold CFE's Book of Business while the parties worked out their differences, on October 27, 2003 Bartfield sought Standard's assurances that if such an arrangement were reached with an existing Standard MGU, Standard would facilitate it.  Standard rejected Bartfield's request without explanation. Bart Dec. ¶ 36.

In November, 2003 Murphy terminated CFE's employment of McDonald. Bart Dec. ¶ 37.

At that point Bartfield found himself going to CFE's office every day to be alone with the partner who had threatened to take him up on the roof and throw him off and harm his family.  No one else would be present except Murphy's apprenticed nephew and two

14

female employees. Bart Dec. ¶ 38.

Bartfield offered to work on the run-out from home and Murphy threatened him that he would break his arms if Bartfield took files out of CFE's offices. Bart Dec. ¶ 39.

So Bartfield started coming into the office irregularly, when no one else was around, and that was largely just to monitor the progress of the run-out. Bart Dec. ¶ 39.

Murphy having prevented Bartfield from participating directly in the run-out, Bartfield moved to Florida and asked Murphy to send him files so he could handle "run-out" from there, but Murphy refused to cooperate. Bart Dec. ¶ 39.

Murphy affected at deposition to have been oblivious throughout this period of destruction to Bartfield's opportunity to make use of CFE's renewal opportunities, Burns Dec. ¶ 2.R-V; yet, on September 19, 2003 Murphy explicitly placed economic value on the renewals. Bart Dec. ¶ 24 and Ex. 4.

Associates ended up with a small portion of CFE's business having a total value between approximately $1,445,081 and $1,658,758 as at May 1, 2004. Burns Dec. ¶ 3 and Ex. 2, p. 6.[5]

Since 2006 $1,245,339.52 has been sitting in CFE's bank

---

[5]     Ms. Niehus' valuation was hampered by unavailability of schedules showing Associates' (a) sold cases and approximate annual premiums, id. p. 3; (b) reserves "for either unreported or unpaid claims", id p. 4; and (c) actual level of operating expenses. Id. p. 5. Hence, Bartfield's need for an accounting remains unresolved by mere discovery.

accounts which Murphy refused to permit CFE to distribute to its members although CFE has no business activity. Bart Dec. ¶ 43. Presumably, Murphy's share of the $1,245,339.52 is now partial security for Bartfield's anticipated judgment against Murphy.

ARGUMENT

I

MURPHY BREACHED HIS<br>FIDUCIARY DUTY TO BARTFIELD

Murphy was a 50% owner of CFE with supervisory and veto power in a business where every underwriter knew what the others were doing and there were no secrets. Burns Dec ¶¶ 2.A, N and Y. Murphy chose not to exercise his supervisory or veto power. Instead he simply terminated CFE and blocked any attempt to salvage its renewal opportunities.

Murphy also had the right to withdraw from CFE and compete with CFE if he were dissatisfied with the way CFE's business was conducted, but he chose not to do that.  If Standard required it, Bartfield, who had given Standard his approval of Murphy's application for appointment by Standard as MGU, Lynn Dec. Ex. N, had the commitment that a prominent member of the industry would have joined him in partnership to conduct the surviving business.

Murphy also had the right to propose to join with Bartfield to sell CFE, or its asset, to another MGU and share the proceeds with Bartfield.  He chose instead simply to terminate CFE, make it impossible for Bartfield to salvage any for himself, and poach

16

a 25% mite for himself.

New York courts have repeatedly afforded a remedy to members of limited liability companies for other members' abuses of their fiduciary duty arising out of their membership in the company. Tzolis v. Wolff, 39 A.D.3d 138, 146, 829 N.Y.S.2d 488, 493 (1st Dep't 2007)(permitting both member's claim for breach of fiduciary duty against another member and derivative action on behalf of LLC), aff'd ___ N.Y.2d ___ (2008); Salm v. Feldstein, 20 A.D.3d 469, 470, 799 N.Y.S.2d 104, 105 (2d Dep't 2005)(both as managing member and "as a co-member with the plaintiff" of limited liability company, "defendant owed the plaintiff a fiduciary duty to make full disclosure of all material facts * * *."); Nathanson v. Nathanson, 20 A.D.3d 403, 799 N.Y.S.2d 83 (2d Dep't 2005)(member may sue managing member for self dealing); Lio v. Zhong, 10 M.3d 1068, 814 N.Y.S.2d 562 (S.Ct.N.Y.Co, 2006)

> ("a cause of action for breach of fiduciary duty between LLC members [including one for damages and one for accounting] is a legally cognizable personal claim of an LLC member.");

Zulawski v. Taylor, 11 M.2d 1058, 815 N.Y.S.2d 496 (S.Ct. Erie Co. 2005)(LLCL §609(a) does not limit claims "made by one member of the LLC against the only other member"; sustaining a claim made under the LLC operating agreement); TIC Holdings, LLC v. HR Software Acquisition Group, Inc., 194 Misc.2d 106, 750 N.Y.S.2d 425 (S.Ct.N.Y.Co. 2002)(sustaining direct claim by LLC member against another member for breach of "his fiduciary duty to" the

17

limited liability company, "by, inter alia: attempting to gain a prospective economic advantage with respect to" that company), aff'd 301 A.D.2d 414 (1st Dept 2003).

Here, of course, CFE was a two 50%-owner entity; thus, much of the injury to Bartfield overlaps the injury to CFE and nothing in the New York Limited Liability Company Law purports to limit a member's rights against another member.

Although fiduciary breaches are rarely as raw as the present one, Murphy's behavior does parallel the behavior of defendant Meadow in Drucker v. Mige Assoc. II, 225 A.D.2d 427, 639 N.Y.S.2d 365 (1st Dep't), lv. denied, 88 N.Y.2d 807 (1996).  Meadow breached his fiduciary duty to his co-general partners, as well as his limited partners, by

> "attempt[ing] to use the voting provisions of the
> partnership agreement for personal gain in
> contravention of the fundamental implied covenant of
> good faith and fair dealing governing the partners'
> fiduciary obligations to one another, and as a threat
> of irreparable harm to his own as well as plaintiffs'
> partnership interests [citation omitted]"

thereby

> "effectively derail[ing] the profitable conversion of
> the partnership's building into a cooperative apartment
> through his unwarranted demands that, if met, would
> have resulted in him receiving an amount of money in
> excess of what the other general partners were going to
> obtain and would have reduced the amount that was left
> over for the limited partners."

Murphy inflicted at least as egregious injury on Bartfield: Murphy deliberately terminated CFE's business; imposed both

economic and physical duress on Bartfield to compel him to
acquiesce in the never defined separation; refused to negotiate
separation terms; prevented Bartfield from salvaging his
investment; and refused mediation.  Murphy chose to do so at the
worst time of the year when 40% of CFE's business and a
substantial amount of potential new business came available for
solicitation, when Murphy himself believed that it was too late
to arrange for another carrier.  Murphy refused to adjourn the
termination to a more reasonable time when Bartfield could have
prepared for it.

Murphy disparaged Bartfield's trustworthiness to Standard.
Murphy terminated the employment of the two other underwriters
whose willingness to follow Bartfield enhanced Bartfield's
credibility in attempting to establish a new enterprise.

At the end, Murphy used physical threats to force Bartfield
out of CFE's offices.  With Standard's help Murphy took
approximately 25% of CFE's business for himself, which is all
that he could attract, and let the rest of it scatter with the
winds rather than let Bartfield have a chance with any of it.

Murphy never pursued less drastic measures to accomplish
what would have been a good faith resolution of whatever the
cause of his dissatisfaction, still undisclosed, might have been.
He did not exercise his right, even duty, of supervision.  He did
not accept Standard's offer of resolution.  He did not propose a

sale of CFE or its asset to another MGU.

Contrary to defendant's argument, Bartfield never agreed to terminate the business; he did what he could to preserve his interest and mitigate his injury.  Nor did Bartfield ever release or otherwise waive his claim against Murphy for his wrongful termination of CFE's business, his threats, his refusal to adjourn his ultimatum to a time when Bartfield could preserve his interest, his refusal to negotiate a reasonable separation agreement, his exploitation of his veto power under CFE's operating agreement to destroy CFE's going concern business, his disparagement of Bartfield to Standard, his discharge of the underwriters who would follow Bartfield in a new enterprise, or his exclusion of Bartfield from the administration of the run-out.

Drucker pointedly sustained the claim that Meadow had breached his fiduciary duty, although dismissing Drucker's claim for failure to prove damages.  Addressing Meadow's counterclaim, Drucker overturned the trial court's award to Meadow of remuneration for services to the partnership because of Meadow's disloyalty.

Drucker's rule also applies as between members of New York limited liability companies. Out of the Box Promotions LLC v. Koschitzki, 15 M.3d 1134, 841 N.Y.S.2d 821, (S.Ct.Kings Co. 2007)

> ("The relationship among LLC members is analogous to
> that of partners, who, as fiduciaries of one another,

20

owe a duty of undivided loyalty to the partnership's
interests.");

Willoughby v. Webster, 13 M.3d 1230, 831 N.Y.S.2d 357 (S.Ct.
Nassau Co. 2006)

> ("A partner, and by analogy, a member of a limited
> liability company, has a fiduciary obligation to others
> in the partnership or limited liability company which
> bars not only blatant self-dealing, but also requires
> avoidance of situations in which the fiduciary's
> personal interest might possibly conflict with the
> interests of those to whom the fiduciary owes a duty of
> loyalty."),

aff'd, ___ A.D.3d ___ (2d Dep't 2007).

The apparent requirement of unanimity between Murphy and
Bartfield contained in CFE's operating agreement (¶ 7, vesting
management in "all" members) did not give Murphy an unbridled
right which he could exercise in a manner that harmed Bartfield.

> "[A] limitation on an apparently unfettered contract
> right may be grounded either on the construction of the
> parties' fiduciary obligations (see Wilf v Halpern, 194
> AD2d 508, lv dismissed 82 NY2d 846; Beck v
> Manufacturers Hanover Trust Company, 218 AD2d 1, 9-11;
> Drucker v Mige Associates II, 225 AD2d 427, 428, lv
> denied 88 NY2d 807) or on the purely contractual rule
> that even an explicitly discretionary contract right
> may not be exercised in bad faith so as to frustrate
> the other party's right to the benefit under the
> agreement (see Kaszirer v Kaszirer, 298 AD2d 109, 110
> [citing Dalton v Educational Testing Serv., 87 NY2d
> 384, 389]; 1-10 Industry Assocs., LLC v Trim Corp. of
> America, 297 AD2d 630, 631-632).

Richbell Information Services, Inc. v. Jupiter Partners, L.P.,
309 A.D.2d 288, 765 N.Y.S.2d 575 (1st Dep't 2003).

Accordingly, Bartfield has a remedy against Murphy for
Murphy's breach of his fiduciary duty to his co-member,

21

Bartfield.

## II

### MURPHY AND ASSOCIATES WERE UNJUSTLY ENRICHED

The elements of this tort, Dfts' Mem p. 21, are present:

First element of unjust enrichment: Murphy escaped his contract ties to Bartfield which Murphy apparently found to be onerous; he and Associates received part of CFE's Book of Business after parking it with Standard.

Second element: the enrichment of Murphy and Associates was at the expense of Bartfield's opportunity to profit from CFE and its renewal opportunities.

Third element: the enrichment resulted from a breach of Murphy's fiduciary duty to Bartfield, enabled by Associates.

## III

### ASSOCIATES AIDED AND ABETTED MURPHY'S BREACH

Associates' argument here depends on the vain hopes that Murphy's acts did not breach his fiduciary duty to Bartfield or that Bartfield has no remedy, confuted in point I, supra.

Associates, we now learn, Dfts' Mem p. 17, was organized to aid and abet Murphy by paying costs of Murphy's administration of CFE's run-out, thereby freeing Murphy from the burden of obtaining Bartfield's required signature on CFE checks which otherwise would have provided Bartfield with a means of exercising some control over his investment.

Associates continued to aid and abet, indeed, enabled,

Murphy's breach of his fiduciary duty to Bartfield by receiving and holding part of CFE's book of business.

Bartfield suffered damage because he was deprived of the benefit of any part of CFE's renewal opportunities.

Incidentally, Murphy's knowledge as sole member of Associates, is symmetric with Associates' knowledge.

IV

<u>DEFENDANTS' ARGUMENTS FOR ESTOPPAL ARE FECKLESS</u>

The significant differences between the present case and Bartfield's and Murphy's litigation with RMTS are (a) here, Murphy acted while a member of CFE; there, Murphy acted after leaving RMTS, and (b) here, Murphy terminated CFE; there Murphy left RMTS and RMTS happily continued in business.

Bartfield does not here contest Murphy's right to approach the same business producers he had approached for CFE.

Bartfield's condonation of Murphy's application for Standard MGU status, while insisting on equal treatment from Standard, does not imply any condonation of Murphy's acts while a member of CFE in frustrating, and then poaching, CFE's business renewal opportunities.

Bartfield does not suggest that Murphy's request for Standard MGU status without more breached Murphy's duty; the breach included Murphy's frustration while a member of CFE of CFE's business renewal opportunities followed by poaching on

23

them.

V

## DEFENDANTS RAISE IRRELEVANT CONCERNS

Bartfield has never claimed that the formation of Associates by itself somehow breached Murphy's fiduciary duty. Dfts' Mem pp. 17-19.  Bartfield's claim is more direct: the formation and use of Associates to receive CFE property either wrongfully cast loose or otherwise obtained in breach of fiduciary duty is one of the steps of the breach.  Murphy's and Associates' unreimbursed use of CFE's resources to divert the business to Associates, Dfts' Mem, p. 19, compounded the tort.

Bartfield's consent that Murphy apply for MGU status, while refusing to hold Standard harmless if Standard treated Murphy and Bartfield unequally, Tsourides Dec. ¶ 4; Bart Dec. ¶ 24, did not in or out of context imply consent to poach on CFE's business. On an equal footing Bartfield and Murphy would have sold or divided up CFE's business and gone on their separate ways, but Murphy's behavior prevented that.

Murphy's argument that Bartfield lacked a direct property interest in CFE's Book of Business, Dfts' Mem pp. 20-21, also misses the point.  Bartfield had invested money and time resulting in his interest in continuing CFE's earnings through renewals and the earned right to receive his share.  Murphy deliberately destroyed that interest and right; even if he felt

24

justification to destroy CFE, so far not shown on this motion, Murphy could have preserved Bartfield's investment in myriad ways, including different timing, cooperating in arrangements with Standard, cooperating in arranging separation or withdrawing from CFE and competing for the business from outside CFE, or proposing a sale of CFE or its asset.

Murphy did none of those things; he simply took what little he could and destroyed what was left.

<u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion should be in all respects denied, this Court should search the record and determine undisputed facts not genuinely at issue and, thereupon, the relief requested at the outset of this memorandum should be granted to Bartfield <u>sua sponte</u>.

Dated: New York, New York
       March 31, 2008

                                     __S/John M. Burns, III__
                                     John M. Burns, III
                                        Attorney for Plaintiff
                                     33 Greenwich Avenue
                                     New York, New York 10014
                                     (212) 360-199011

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x  06 cv 6435 (RJH)(HP)

JOSEPH BARTFIELD,                      :  ECF CASE

                     Plaintiff,        :  DECLARATION OF
                                          JOHN M. BURNS, III
          -versus-                     :  IN OPPOSITION TO
                                          SUMMARY JUDGMENT
JAMES B. MURPHY, J. B. MURPHY          :
ASSOCIATES LLC, STANDARD SECURITY
LIFE INSURANCE COMPANY OF NEW YORK     :
and CFE MANAGEMENT LLC,

                                       :
                     Defendants.
                                       :
- - - - - - - - - - - - - - - - - -x

     I, John M. Burns III, hereby declare as follows:
     1.  I am an attorney admitted to practice law in this Court.
I am the attorney for plaintiff in this action.
     2.  On March 31, 2008 I sent true copies of the following
documents:
          PLAINTIFF'S MEMORANDUM IN OPPOSITION TO SUMMARY
          JUDGMENT

          PLAINTIFF'S STATEMENT PURSUANT TO LOCAL RULE 56.1

          DECLARATION OF JOSEPH BARTFIELD IN OPPOSITION TO
          SUMMARY JUDGMENT PLUS EXHIBITS

          DECLARATION OF JOHN M. BURNS, III IN OPPOSITION TO
          SUMMARY JUDGMENT PLUS EXHIBITS

          DECLARATION OF HARALAMBOS TSOURIDES,

by email to the attorney for defendants, Theodore P. Lynn, Esq.,
at his email address, jlynn@lynncahill.com, that being the manner
in which we have agreed to serve each other in this case.
     I declare at New York, New York, under penalty of perjury
under the laws of the United States that the foregoing is true
and correct.
     Executed this 31st day of March, 2008 at New York, New York.

                                    s/ John M. Burns, III
                                   John M. Burns III