UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------

JOSEPH BARTFIELD,

                              Plaintiff,

        -against-                                              06 Civ. 6435 (RJH)(HP)

                                                              **MEMORANDUM OPINION
JAMES B. MURPHY and J.B. MURPHY                                AND ORDER**
ASSOCIATES, LLC,

                              Defendants.

--------------------------------------------------------


        Now before the Court is defendants' motion for summary judgment in an action

by plaintiff, Joseph Bartfield, a member of a limited liability company, CFE Management

LLC ("CFE"), alleging breaches of fiduciary duty and unjust enrichment by CFE's

second member, James B. Murphy, aided and abetted by his wholly-owned company,

J.B. Murphy Associates LLC.  Prior to argument on this motion, the Court *sua sponte*,

raised the issue of its subject matter jurisdiction.  In an Order dated July 2, 2008, the

Court directed the parties to file supplemental letter briefs addressing whether CFE was

an indispensable party under Rule 19 and, if so, whether diversity jurisdiction would be

lacking since an LLC has the citizenship of each of its members.  Having reviewed the

parties' submissions and heard argument on the issue, the Court finds that all but one of

plaintiff's claims are derivative claims for direct injuries to CFE, that CFE is an

indispensable party to those claims, and that joinder of CFE on such claims would

destroy diversity jurisdiction.  Because joinder is impossible and because plaintiff may

pursue those claims in state court, the derivative claims are dismissed.

# BACKGROUND

Plaintiff Joseph Bartfield ("Bartfield") and defendant James Murphy ("Murphy") decided to go into business with one another in 1999 to market and administer medical stop-loss insurance policies. (Am. Compl. ¶ 8.) Bartfield and Murphy organized CFE to serve as the business entity through which they would operate as a Managing General Underwriter ("MGU").[1] (*Id.* ¶ 11.) Bartfield and Murphy were the only members of CFE, and each held a 50% interest. (*Id.* ¶ 13.) On February 8, 2000, Bartfield and Murphy executed a written operating agreement for CFE that established that management was vested in all the members, and that either member could withdraw on written notice, giving the other member a right of first refusal to purchase the withdrawing member's interest. (*Id.* ¶ 15.)

CFE was first appointed as an MGU for two Highmark companies, and later sought to become an MGU for Standard Security Life Insurance Company of New York ("Standard"). (Bartfield Dep. at 38, 46–47.) On May 1, 2000 CFE was appointed as an MGU for Standard; the two entered into a contract that authorized CFE to quote and issue insurance policies. (Not. of Mot., Ex. F.) Bartfield and Murphy proceeded to manage CFE for approximately three years, issuing stop-loss insurance policies on behalf of Standard, administering those policies and adjusting claims as necessary. (*See* Am. Compl. ¶¶ 22–23.)

According to Murphy, by August 2003 he had become unhappy with Bartfield's underwriting decisions and decided to stop working with Bartfield and go into business

---

[1]  Medical stop-loss insurance policies indemnify employers against catastrophic medical expenses in excess of a certain sum. (Am. Compl. ¶ 9.) An MGU acts as a general agent for an insurance carrier and will market, negotiate, issue, and administer insurance policies issued by that carrier. (*Id.* ¶ 10.)

for himself. (Murphy Dep. at 12, 15–30, 51–57; Bartfield Decl. ¶ 14.) Bartfield says that he learned of Murphy's decision at a meeting in CFE's conference room on about August 28, 2003, and complains that Murphy should have agreed to renew the policies previously written by CFE rather than terminate the business in its entirety. (Bartfield Decl. ¶¶ 14–15.)[2]

Around the time of this meeting, Bartfield and Murphy each contacted Harlambos Tsourides ("Tsourides"), at that time the officer of Standard directly responsible for supervising CFE's underwriting. (Bartfield Decl. ¶ 19; Tsourides Decl. ¶¶ 2–3.) According to Bartfield, Murphy must have received assurances before meeting with Bartfield that Standard would aid Murphy in a "plan" or "prepared scenario" to take over CFE's clients. (*See* Bartfield Decl. ¶9.) Tsourides stated that Murphy "advised Standard Security about this intention [to leave CFE]," and that Standard had contemplated its response to any potential break-up, but did not say that he told Murphy about Standard's proposed response. (Tsourides Dep. ¶ 3.) Further, Tsourides assured Bartfield that Standard was very unlikely to offer Murphy an appointment as an MGU without offering a similar appointment to Bartfield. (*Id.* ¶ 4.) In a later conversation, Tsourides reassured Bartfield that Standard had no desire to take former clients of CFE for itself, but merely sought to preserve the status quo while determining whether Bartfield and/or Murphy would be appointed as an MGU. (*Id.* ¶ 5.)[3]

---

[2]   Rachel Lipari, another officer of Standard, reports meeting with Bartfield and Tsourides in June, 2003, where Bartfield said that he and Murphy were not getting along, and wanted to look for other business relationships "with or without Murphy." (Not. of Mot. Ex. W, at 47–49 (Lipari Dep.).)

[3] Standard was originally named as a defendant in the present action but was voluntarily dismissed by plaintiff. (Order, March 16, 2007.)

Although the facts surrounding the meeting are in dispute, Murphy and Bartfield signed a joint letter to Standard on September 4, 2003 to notify it of their "decision to part company and go [their] separate ways," except that the two would remain involved in the administration and run-out of outstanding policies underwritten by CFE.[4] (Not. of Mot. Ex. G.) Upon receipt of this letter, Standard notified Everest Reinsurance, which terminated its reinsurance of CFE's policies pursuant to their agreement with Standard. (Not. of Mot. Ex. H, I.) Standard in turn exercised its contractual right to terminate CFE as an MGU as of December 9, 2003, leaving CFE unable to write any new policies on or after that date. (Not. of Mot. Ex. H, I.)

Bartfield claims that he intended to notify Standard of the potential of a future separation rather than announce Murphy's imminent departure in the September 4 letter, that he wanted to maintain CFE as a going concern, and that in any event he signed this letter under physical and economic duress. (Bartfield Decl. ¶¶ 14–17, 21.)[5] Further, even if Murphy's departure was inevitable, Bartfield claims that Murphy should have continued to work for CFE until a time better suited for his departure and after the details of the separation had been negotiated, (*See Id.* ¶ 18). Finally, Bartfield claims that while he was interested in mediation to avoid terminating CFE, Murphy rejected mediation. (Mem. in Opp. at 10–12.)

Over the following weeks Bartfield sent several letters to Standard, about which he makes no claim of duress. (*See* Bartfield Decl. ¶ 18; Bartfield 56.1 Statement,

---

[4]  Stop-loss insurance policies require administration for several years after issuance to, *inter alia,* adjust claims made and collect any premiums due.

[5]  At oral argument, counsel for plaintiff stated that "[Bartfield] was physically threatened, although I agree with Mr. Lynn's observations that probably it was not a serious threat." (Summ. J. Hr'g Tr. 15–16.)

passim.)  Bartfield and Murphy first wrote another joint letter to Standard on September 8, 2003 to confirm that "it is the intention of CFE Management LLC to continue to write and renew business with [Standard] with effective dates no later than December 8, 2003." (Not of Mot. Ex. K.)  Soon thereafter, Bartfield and Murphy each applied to Standard for appointment as an MGU, and confirmed that they had no objection to the other's application.  (*Id.* Ex. N, O, P (Murphy E-mail to Standard, Sept. 8, 2003; Bartfield E-mail to Standard, Sept. 9, 2003; David Kettig Letter to Murphy and Bartfield on behalf of Standard, Sept. 12, 2003).  Bartfield also wrote to Standard on September 8, 2003 to set out his plan to form a new company to "continue in the stop loss underwriting and claims management business on behalf of Standard Security," and to "continue with the producer relationships created and nurtured throughout the past few years."  (*Id.* Ex. L.) Bartfield claimed that he had "discussed [his plans] with Jim [Murphy] and we are in agreement on such proposed structure."

On September 15, 2003 Bartfield responded to a letter from Tsourides recommending that the partners mediate their disputes and attempt to continue doing business through CFE.  (Not. of Mot. Ex. P, Q.)  Bartfield explained that "the consensus of our going-forward team is that there have been too many unpleasant sentiments expressed to allow any of us to reasonably foresee a continuation of the current partnership with Jim [Murphy] beyond the run-out."  (*Id.* Ex. Q.)  Bartfield stated that "[w]hile the run-out is obviously a first priority," the "more time sensitive priority" was that Standard act promptly on his application to be appointed as an MGU, to "serve our producers' [i.e. CFE's clients'] needs with respect to January 2004 business (both new and renewals)."  (*Id.*)

As a result of their falling-out, Bartfield and Murphy each formed new firms to compete for business as an MGU:  Bartfield formed Gotham Management in October 2003, (Mem. in Opp. at 13; Not. of Mot. Ex. Q), and Murphy formed Defendant J.B. Murphy Associates ("Murphy Associates") in November 2003.  (Not. of Mot. Ex. X at 296.)  Standard ultimately selected Murphy Associates to be its MGU in May 2004.  (*Id.* at 301–03; Mem. in Opp. at 13–15.)

During late 2003, Bartfield alleges he began to feel unsafe going to CFE's offices, and offered to take files home to work on the run-out from there; Murphy allegedly threatened Bartfield with physical harm were he to do so.  (Bartfield Decl. ¶¶ 38–39.) Bartfield began to come into the office irregularly, and soon thereafter decided to move from New York to Florida.  (*Id.*)  Murphy refused to send copies of CFE's client files to Florida so that Bartfield could work on the run-out.  (*Id.*; Mem. in Opp. at 15.)  Doing so prevented Bartfield from directly participating in the run-out and destroyed his "opportunity to make use of CFE's renewal opportunities."  (Mem. in Opp. 15; Burns Decl. ¶ 2R–V.)  Bartfield does not seem to dispute that Murphy collected all monies due CFE and properly adjusted claims arising under the existing policies.

The parties remained in an effective stalemate with regard to CFE's assets during the run-out of CFE's existing policies.  During this period a former employee of CFE brought suit against CFE for compensation and a share of CFE's profits.  (See Pl.'s Ltr. Br. 2.)  In 2006, Bartfield filed the instant action.  In the original complaint Bartfield named CFE as a party defendant and sought its dissolution.  Perhaps recognizing that CFE's presence in the litigation destroyed diversity jurisdiction, Bartfield subsequently amended the complaint to exclude CFE as a named defendant.

**DISCUSSION**

**A.     Citizenship of Parties**

Bartfield is a citizen of the state of Florida.  (Am. Compl. ¶ 2.)  Murphy is a
citizen of the state of New York, (*Id.* ¶ 3) and is the sole member of Murphy Associates.
(*Id.* ¶ 48.)  CFE is a limited liability company whose members are Bartfield and Murphy.
(*Id.* ¶¶ 1, 20.)[6]  "For purposes of diversity jurisdiction, a[n] LLC has the citizenship of
each of its members."  *Bischoff v. Boar's Head Provisions Co.*, 436 F. Supp. 2d 626, 634
(S.D.N.Y. 2006); *Carden v. Arkoma Assoc.*, 494 U.S. 185, 195–96 (1990) ("[C]itizenship
of an artificial entity . . . in a suit by or against the entity depends on the citizenship of
'all the members,' 'the several persons composing such association,' [or] 'each of its
members.'") (internal citations omitted).

**B.     Diversity Jurisdiction**

"A case falls within the federal district court's original diversity jurisdiction only
if diversity of citizenship among the parties is complete, i.e., only if there is no plaintiff
and no defendant who are citizens of the same State."  *Wisconsin Dept. of Corr. v.
Schacht*, 524 U.S. 381, 388 (1998) (quotations and citation omitted); 28 U.S.C. § 1332.
A district court may raise the issue of subject matter jurisdiction *sua sponte*, and due to
the constitutionally limited jurisdiction of the Federal Courts, is obligated so to do if it
lacks jurisdiction.  *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109
F.3d 105, 107 (2d Cir. 1997); *Baer v. United Services Auto. Assoc.*, 503 F.2d 393, 396–97
(2d Cir. 1974) (citation omitted).  Bartfield and Murphy have diverse citizenship.

---

[6]  Both parties agree that CFE is not a party to the instant action, and is only listed in the caption due to its
inclusion in the original Complaint; CFE has not been served in the instant action.  (See Pl's Letter Br. at 1;
Def. Ltr. Br. at 1.)

Therefore, subject matter jurisdiction is lacking only if CFE, a non-diverse entity, is a necessary and indispensable party under Fed. R. Civ. P.19 whose joinder would destroy jurisdiction.

## C.    Mandatory Party Joinder

Rule 19 mandates that parties with an interest in the subject of an action be joined when necessary to avoid "impair[ing] or imped[ing] the person's ability to protect the[ir] interest," and empowers a court to dismiss an action when it is impossible to join a party without which the action cannot equitably proceed.  Fed. R. Civ. P. 19.  "[Rule 19] sets forth a two-step test for determining whether an action must be dismissed for failure to join a party.  First, a court must determine whether an absent party belongs in the suit, i.e., whether the party qualifies as a 'necessary' party under Rule 19(a)," and if so, must then determine if "in equity and good conscience, the action should proceed among the existing parties or should be dismissed."  *Viacom Int'l Inc. v. Kearney*, 212 F.3d 721, 724–25 (2d Cir. 2000); Fed. R. Civ. P. 19.

"[T]he absence of an indispensable party is considered to be so significant a defect that most courts have indicated that it may be raised for the first time subsequent to the trial or on appeal."  Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, 7 Fed. Prac. & Proc. Civ. § 1609 (3d ed. 2008).  Further, "the issue of indispensability is one that courts have an independent duty to consider *sua sponte,* if there is reason to believe dismissal on such grounds may be warranted."  *Citizens Against Casino Gambling in Erie County v. Kempthorne*  471 F. Supp. 2d 295, 312 (W.D.N.Y. 2007).  Courts apply the four-factor test set out in Rule 19(b) to determine if a party is indispensible regardless of the point at which he issue is raised, *see Universal*

*Reinsurance Co. v. St. Paul Fire and Marine Ins. Co.,* 312 F.3d 82, 87–88 (2d Cir. 2002).[7]

## D.     Mandatory Joinder in Derivative Actions Under New York Law

Generally, an individual only has standing to bring suit when a wrongful act injures a legal right or property interest he holds.  *See, e.g., Warth v. Seldin,* 422 U.S. 490, 500–01 (1975).  However, the common law often gives an individual standing to bring a 'derivative' action on behalf of a legal entity, such as a corporation, in which he holds an interest if that entity would be the only party entitled to bring a direct suit and has failed to do so.  In a derivative action, the corporation is an indispensable party in order, *inter alia,* to avoid the risk of double recovery were the corporation to bring a direct suit at a later date, and to avoid exposing the company to liability for any disposition of assets due it that are recovered pursuant to the derivative action, 7 Fed. Prac. & Proc. Civ. § 1615.  ("In a stockholder-derivative suit, the corporation whose rights are being enforced must be made a party to the action . . .").  Whether a claim is derivative or direct is a question of state law.  *Aboushanab v. Janay*, No. 06 Civ. 13472, 2007 WL 2789511, *6 (S.D.N.Y. Sept. 26, 2007) ("For the purposes of determining whether Plaintiffs have standing to bring a direct rather than an indirect, or derivative claim against Defendants for fraud, the law of the state of incorporation applies."); *see also Strougo v. Bassini*, 282 F.3d 162, 168-69 (2d Cir. 2002) (holding that state law

---

[7] The enumerated factors are:  "(1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties; (2) the extent to which any prejudice could be lessened or avoided by:  (A) protective provisions in the judgment; (B) shaping the relief; or (C) other measures; (3) whether a judgment rendered in the person's absence would be adequate; and (4) whether the plaintiff would have an adequate remedy if the action were dismissed for non-joinder."  Fed. R. Civ. P. 19(b).

applies to question of whether claim under Investment Company Act is direct or derivative).

By 1970, New York had codified the right of a shareholder in a business corporation and a limited partner in a limited partnership to sue derivatively.[8] NY CLS BCL § 626(a); NY CLS Partn. § 115-a. However, until recently some lower state courts held that a member of an LLC did not have standing to bring a derivative action. *E.g., Hoffman v. Unterberg,* 9 A.D.3d 386, 388-89 (2d Dep't 2004); *Out of the Box Promotions LLC v. Koschitzki*, 841 N.Y.S. 2d 821, 821 (Sup. Ct. Kings Co. 2007). This was not a universal conclusion; some state courts and most federal courts held that New York law gives LLC members standing to bring derivative suits. *E.g.*, *Tzolis v. Wolff*, 39 A.D.3d 138, 139-40 (1st Dep't 2007), *aff'd* 10 N.Y.3d 100; *Bischoff*, 436 F. Supp. 2d at 633-34.[9]

The New York Court of Appeals recently resolved the split by confirming that a member of an LLC has standing to sue derivatively. *Tzolis v. Wolff,* 10 N.Y. 3d 100, 105–106 (2008). The Court rejected lower court decisions that denied derivative remedies for LLC members, noting that the resulting efforts to recognize direct claims by members for injuries in fact suffered by an LLC resulted in "blurring if not erasing, the traditional line between direct and derivative claims." *Id.* 10 N.Y. at 106, ("[W]e will not readily conclude that the Legislature intended to set us on this uncharted path.")

---

[8]  A shareholder's standing to bring a derivative action under New York law was first recognized in 1832. *Tzolis v. Wolff*, 10 N.Y.3d 100, 103 (2008) (citing *Robinson v Smith,* 3 Paige Ch 222 (1832)). Similarly, the right of a limited partner to bring a derivative suit on behalf of the partnership was recognized under the common law before its enactment in a statute. *See Id.* at 104–05 (citing *Klebanow v NY Produce Exch.*, 344 F.2d 294, 298 (2d Cir 1965) and *Riviera Congress Assoc. v Yassky* 18 N.Y.2d 540, 547 (1966)).

[9] Often found by analogy to the standing a shareholder or limited partner has to bring a derivative action since "[t]he LLC was designed as a hybrid of the corporate and limited partnership forms." *Bischoff*, 436 F. Supp. 2d at 630 (citing *Weber,* 110 F. Supp. 2d at 131).

Traditionally, courts apply the "direct injury test" to determine if a shareholder's claim must be raised derivatively.  *See, e.g. Excimer Assocs. v. LCA Vision, Inc.*, 292 F.3d 134, 139–140 (2d Cir. 2002).  The issue is whether the "primary injury" for which relief is sought directly affects an interest the plaintiff holds, or if it injures the legal entity's interests, which then derivatively injures the plaintiff.  *Id.* ("[T]he critical question posed by the direct injury test is whether the damages a plaintiff sustains are derivative of an injury to a third party.  If so, then the injury is indirect; if not, it is direct."); *Lenz Ex. Rel. Naples Tennis Resort,* 833 F. Supp. 362, 379-80 (S.D.N.Y. 1993) ("[T]he determination of whether a suit is derivative or direct turns on the nature of the injury alleged and the entity which sustains the harm.").

Even before the definitive decision in *Tzolis*, most courts in this circuit correctly concluded that New York LLC's could sue derivatively and that the "direct injury test" should be used to determine if a claim by one member of an LLC against another is direct or derivative under New York law.  *See, e.g. Bischoff*, 436 F. Supp. 2d at 633 ("[Plaintiff] has alleged significant personal losses but only as a result of FB Co.'s losses of several hundred million dollars due to defendants' alleged misconduct.  The cause of action thus belongs to the LLC, and . . . [plaintiff's] injury flows from his status as a member of FB Co.") (citing *Excimer Assocs.*, 292 F.3d at 139–40); *Brownstone Investment Group, LLC v. Levey*, 468 F. Supp. 2d 654, 662 (S.D.N.Y. 2007) (holding counterclaim/third-party claim by one LLC member against another for breach of fiduciary duty and aiding and abetting breach of fiduciary duty was derivative because harm from alleged breaches would be to LLC); *Weber v. King*, 110 F. Supp. 2d 124, 130-33 (E.D.N.Y. 2000); s*ee also McGee* v. *Dresnick*, No. 04 CV 6684 (RAG), 2005 U.S. Dist. Lexis 18244, *4–*6

(N.D. Ill., Aug. 24, 2005) (claim derivative when member can prevail "only by showing an injury or breach of duty to the corporation") (quotation omitted).

**E.      Direct or Derivative Nature of Plaintiff's Claims**

Plaintiff's first claim for relief alleges a breach of fiduciary duty that injured his "direct, indirect, or residual interest in CFE's book of business and/or its benefits." (Am. Compl. ¶¶ 1, 30.) Plaintiff sets out thirteen individual breaches that, he argues, entitle him to prevail on his first claim for relief. (*Id.* ¶ 31 (A-M).)

Bartfield alleges that Murphy arranged a scheme to force CFE to stop marketing and induced Standard Security to cancel its agreement with CFE. (*Id.* ¶ 31 (A–E).) The allegation that CFE was forced out of business is on its face an allegation of a direct injury to CFE; similarly, inducing the breach of a contract to which Plaintiff was not even a party is on its face an allegation of harm to CFE, as the nonbreaching party. (*See Id.*) Bartfield's injury and claim for relief only accrues because *he had an interest in CFE*; his claim is not "independent of [his] status as a shareholder, investor, or creditor"; and the primary injury proximately caused by the alleged wrongful acts was to CFE. Hence, claims A through E set forth in Paragraph 31 of the Amended Complaint are properly construed as derivative. *Weber,* 110 F. Supp. 2d at 132; *Bischoff*, 436 F. Supp. 2d at 633 (holding claim to be derivative where personal losses resulted from company losses); *see also McGee,* 2005 U.S. Dist. Lexis 18244 at *5–*6 (holding claim that defendant improperly dissolved LLC to be derivative as it did not allege injury distinct from harm to LLC).

Bartfield further alleges that Murphy failed to cooperate to preserve CFE's "book of business." (Am. Compl. ¶ 31 (F).) It is undisputed that the "book of business" was an

12

asset of CFE. (Am. Compl. ¶ 25.) Under New York law, neither Murphy nor Bartfield

hold any direct property interest in the "book of business." NY CLS LLC § 601 ("A

membership interest in the limited liability company is personal property. A member has

no interest in specific property of the limited liability company."). Claims that CFE

assets were misappropriated allege an injury to CFE, and an injury to Bartfield that is

entirely derivative of Murphy's failure to preserve an asset owned by CFE. *See Hoffman*,

9 A.D.3d at 388-89 (dismissing claim for diversion and misappropriation of funds

belonging to the LLC on the ground that the plaintiff had no right to make such a claim in

his individual capacity)[10]; *Weber*, 110 F. Supp. 2d at 130 ("If the Company's assets are

threatened by the Additional Defendants' picketing, only the Company has standing to

challenge such a threat.").

A similar rationale applies to the claims that Murphy organized Murphy

Associates to act as an MGU and steal CFE's book of business, that Murphy solicited the

renewal business of CFE's "book of business," and that Murphy "diverted business" from

CFE to Murphy Associates or to Standard. (Am. Compl. ¶ 31 (G–J).) Any

misappropriation or injury to an asset owned by CFE is a direct injury to the asset's

owner. *See Bischoff*, 436 F. Supp. 2d at 633; *Weber*, 110 F. Supp. 2d at 130. The Court

concludes that Bartfield can only derivatively raise claims alleging misappropriation or

destruction of assets owned by CFE as he holds no property right in the assets of CFE;

any diversion of assets owned by CFE is necessarily an injury to CFE.

---

[10] Although *Hoffman* is probably no longer good law after *Tzolis* with respect to the lack of derivative standing, the Court looks to its analysis of whether a claim is direct or derivative. *See generally Tzolis*, 10 N.Y.3d 100.

Bartfield further alleges that Murphy used CFE assets to divert business. (Am. Compl. ¶ 31 (K).) The Court finds it proper to distinguish between misappropriation of *Bartfield's* assets, a direct injury, and misappropriation of CFE's assets, an injury to Bartfield indirectly because of his opportunity to benefit from CFE's use of those assets.[11] *Cf McGee,* 2005 U.S. Dist. Lexis 18244 at *5–*6 (holding claim for appropriation of Plaintiff's individual business materials direct, claim for injury to corporate business opportunities derivative). This claim alleges harm to an asset belonging to CFE, and Bartfield has again not shown that he was directly deprived of any legal right or opportunity other than as an indirect result of an injury to CFE's interests. The Court therefore concludes that this claim is also derivative.

However, the Court finds that Bartfield's claim that Murphy failed to disclose certain material facts may support a direct suit. (Am. Compl. ¶ 31 (L).) The duty of full disclosure is one owed by Murphy to Bartfield, not one owed to CFE, and can support a direct suit. *Salm v. Feldstein*, 20 A.D.3d 469, 470 (2d Dep't 2005) (failure to disclose third party offer for LLC prior to defendant member's purchase of plaintiff's shares). As the nature of Bartfield's disclosure claim and the damages resulting therefrom are not sufficiently detailed for the Court to conclude that plaintiff has or has not alleged harm for which he has a right to directly recover, the Court directs plaintiff to file a more definite statement of its claim (in the event that he wishes to pursue this claim in federal court).

---

[11] Bartfield has a direct right to use any of his business assets for his individual benefit, whereas even if Murphy did not wrongfully use CFE's resources, Bartfield does not have a direct right to use them for his individual benefit, and might well act wrongfully were he to do so.

Plaintiff further claims that Murphy assumed control of and excluded Bartfield from control of CFE. (Am. Compl. at ¶ 31 (M).) There is some support for the proposition that the duty to use voting provisions in good faith is rooted in the fiduciary duty between members, which might give standing for a direct action. *See Drucker v. Mige Assocs. II*, 225 A.D.2d 427, 428 (1st Dep't 1996). However, the injury Bartfield alleges demonstrates that claim M is derivative. Bartfield alleges that Murphy misused his voting power by vetoing the writing of new policies and thereby "destroy[ing] CFE's going concern business" between September and December, 2003. (Mem. in Opp. at 12–13, 20.) Significantly, Bartfield has disclaimed that he is seeking to recover for the injury to his ownership interest in CFE, (Pl.'s Letter Br., July 10, 2008 at 5); hence, Bartfield appears only to seek recovery for injuries Murphy's veto may have caused CFE. Such a claim is derivative. Thus of the thirteen breaches of duty alleged in plaintiff's first claim, only one, claim L, is potentially direct. (Am. Compl. ¶ 31 (A-E).)

Plaintiff's second claim for unjust enrichment is straightforwardly derivative. Under New York law a claim for unjust enrichment has elements of "(1) the defendant was enriched; (2) enrichment was at the plaintiff's expense; and (3) the defendant's retention of the benefit would be unjust." *Gitadex, S.r.L. v. Campaniello Imps, Ltd.* 49 F. Supp. 2d. 298, 301 (S.D.N.Y. 1999) (citation omitted).[12] Bartfield alleges that defendants' enrichment was "at the expense of Bartfield and his interest in CFE." (Am. Compl. ¶ 37.) The enrichment alleged, however, is Murphy Associates' acquisition of CFE's "diverted business." (*Id.*) Because Bartfield could only recover by showing the

---

[12]   The Court does not reach the issue of whether plaintiff can state a claim for unjust enrichment, given that a explicit contract exists; it is a longstanding tenet of contract law that a quasi-contractual remedy is only available if no express contractual obligation exists. *See Gidatex*, 49 F. Supp. 2d at 301 n.4.

enrichment was at the expense of CFE, "his reasonable share of the [b]enefits and profits of CFE's book of business" only exists insofar as CFE is entitled to profit from the "book of business." As discussed *supra*, the Court has found no interest Bartfield claims in CFE's "book of business" that is not derivative of CFE's right to that business.[13]

Bartfield's third claim is against Murphy Associates for aiding and abetting a breach of fiduciary duty by Murphy. (Am. Compl. ¶ 46.) The description of the breach and the wrongful act are telling: Murphy Associates is alleged to have "knowingly received and held property in which the Joint Venture, CFE, and Bartfield had an interest." (*Id.* ¶¶ 53, 55.) The breach that this allegedly aides is that "[w]hile a member of CFE Murphy pursued for himself and/or Murphy Associates business relations *which are the property of CFE* and employed the assets and resources of CFE to conduct Murphy Associates' business." (*Id.* ¶ 50 (emphasis added).) As Associates allegedly aided the misappropriation of CFE assets, and as Bartfield seeks to recover assets owned by CFE, his claim is properly characterized as derivative. *Bischoff,* 436 F. Supp. 2d at 634.

Bartfield's fourth claim for unjust enrichment similarly alleges that Murphy Associates received and held property due CFE. (Am. Compl. ¶¶ 60–63.) As repeatedly noted *supra*, a claim to recover for misappropriation of an asset owned by CFE is derivative. The Court further notes that Bartfield is claiming that he should recover the share to which he would have been entitled had *CFE* not suffered a loss; were CFE not entitled to the "diverted business" he would have no claim. (*Id.* ¶65.) Therefore his claim is derivative.

---

[13] Bartfield explicitly denies that he is seeking to recover for the diminution in *value* of his ownership interest in CFE, and his Amended Complaint seems to only claim a recovery related to the "diverted business." (Pl.'s Letter Br., July 10, 2008 at 5; Am. Compl. ¶¶ 42–43.)

**F.  CFE Cannot Be Joined, Yet Is Indispensable To Bartfield's Derivative Claims**

As an initial matter, the Court must determine if CFE is necessary to the adjudication of the instant action and must therefore be joined under Rule 19(a).  *See Viacom Int'l, Inc.*, 212 F.3d at 724.  Rule 19(a) provides that the absent party should be joined, if feasible, where "(2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest."

CFE is a necessary party under Rule 19(a) since it has an obvious interest in the derivative claims raised on its behalf, and would be unable in practice to protect that interest if not joined.  CFE is a "separate legal entity" with rights and obligations distinct from those of its members; the Court cannot presume its interests are not also distinct from those of its members.  *See* NYLLCL § 203(d); *Weber*, 100 F. Supp. 2d at 127–28, 133.  For example, it may be in CFE's interest to pay obligations to third parties out of any recovery of a derivative claim.  *See Weber*, 100 F. Supp. 2d at 128.  In this regard, the Court takes note of the pending suit by a former employee seeking a percent of CFE's profits.  It is also the case that an adverse judgment against the defendants in the present case would expose them to the risk of duplicate recoveries in the event that CFE subsequently asserted direct claims against them.  This risk can be avoided, of course, by joining CFE as a party.

While CFE is clearly a necessary party, it is equally obvious that it cannot be

made a party to this action without destroying jurisdiction. As an LLC with members who are citizens of Florida and New York, CFE has citizenship in both states. *Bischoff*, 436 F. Supp. 2d at 634 (citing *Handelsman v. Bedford Vill. Assocs. Ltd. P'ship,* 213 F.3d 48, 51–52 (2d Cir. 2000)). As CFE shares citizenship with both Bartfield and Murphy, the Court would lack diversity jurisdiction under 28 U.S.C. § 1332 were it to be a party. Since joinder is not feasible, the Court must determine if CFE is an indispensable party under Rule 19(b) and whether "in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. Rule Civ. Proc. 19(b); *see also Republic of Philippines v. Pimental*, 128 S.Ct. 2180, 2189-93 (2008).

Rule 19(b) instructs the Court to consider a non-exclusive list of factors, including the extent a judgment rendered in the party's absence might be prejudicial to the person or those already parties; the extent to which protective provisions in the judgment, the shaping of relief, or other measures can lessen or avoid prejudice; whether a judgment rendered in the person's absence will be adequate; and whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder. Fed. R. Civ. P. 19(b); s*ee also Republic of Philippines*, 28 S.Ct. at 2189. Applying these factors, courts appear unanimous in concluding that the party on whose behalf a derivative claim is brought is indispensable and one whose absence warrants dismissal. *See Weber*, 110 F. Supp. 2d at 127–30; *see also* 7 Fed. Prac. & Proc. Civ. § 1615 (3d ed. 2008). As noted, proceeding in the absence of CFE risks inconsistent or multiple obligations that could be prejudicial to either CFE or Murphy. While the Court is unable to shape relief to avoid such prejudice, plaintiff has an adequate state court remedy that would avoid prejudice to any party.[14]

---

[14] Plaintiff is the only party not resident in New York; by bringing this action, he has demonstrated it is possible and convenient for him to bring suit in New York.

Hence, the Court concludes that equity and good faith preclude adjudicating the derivative claims among the existing parties. Since joinder of CFE is not feasible, these claims should be dismissed. *Weber, Id.*, 110 F. Supp. 2d at 133 (citing *Ross v. Bernhard*, 396 U.S. 531 (1970)).

**G.      CFE Is Also Indispensable to Plaintiff's Claim for a Declaratory Judgment.**

Bartfield's final claim for a declaratory judgment cannot be properly adjudicated without CFE. (*Id.* ¶ 91.) This claim seeks an adjudication of the rights of Bartfield and Murphy in CFE's "book of business," an accounting of plaintiff's share of the "diverted business" and of any "diverted business" in Murphy's possession or control, a constructive trust over the "diverted business" and proceeds thereof, and punitive damages. (*Id.* ¶¶ 91, 95.) Plaintiff makes a similar claim against Murphy Associates. (*Id.*) He also asks "this Court [to] declare[] the two member's rights" with respect to the "diverted business" and the $1,245,339.52 presently in CFE's accounts, and that the "declaratory relief requested here includes allocation of that distribution." (Am. Compl. ¶ 95; Pl's Letter Br. 2.)[15]

To adjudicate plaintiff's declaratory judgment claim the Court must determine: (1) if assets of CFE were "diverted" to defendants, i.e. what, if anything, is owed CFE, and second, of those assets, what, if anything, CFE owes to Bartfield. Plaintiff claims that he is the "real party in interest," (Pl. Ltr. Br. 3), asking the Court to treat CFE as a legal fiction on the basis of a case where a limited partnership with one partner was not

---

[15]   Plaintiff seemingly withdraws his claim for distribution of these funds in his declaration, while reasserting his desire to have the Court adjudicate its allocation in his letter brief. (Bartfield Decl. ¶ 43; Pl's Letter Br. 2.) The Court is being asked to determine the rightful allocation of funds belonging to CFE without giving CFE an opportunity to respond to the parties' claims on its assets.

indispensable to a suit by the "sole owner of the fund [at issue]." *See Int'l Equity Invs.,*
*Inc. v. Opportunity Equity Partners, Ltd.*, 411 F. Supp. 2d 458, 464–465 (S.D.N.Y.
2006). Here, of course, there are two members of an LLC who have competing,
inconsistent claims to the company's assets (as well as an ex-employee suing for a share
of the same assets in unrelated litigation). In this situation, it is entirely inappropriate to
determine ownership of the "diverted business" without making CFE a party. CFE may
wish to contend that Murphy should pay more than Bartfield demands or that it has other
obligations that should be evaluated when determining what is due Bartfield. Unless
joined, CFE would either be unable to make such arguments, or could only do so in a
separate lawsuit thereby exposing defendants to a risk of subsequent, inconsistent
obligations. As the requested judgment would directly determine the rights of CFE, the
Court finds that CFE has an interest sufficient to require joinder and would suffer
prejudice if not joined. Plaintiff's characterization of his claim as one for declaratory
relief does not remedy the nonjoinder of CFE, an indispensable party to Bartfield's
underlying claims among the existing parties. *Republic of Philippines*, 128 S.Ct. at
2192–93. As CFE cannot be joined, the declaratory judgment claim must also be
dismissed under Rule 19(b).

## CONCLUSION

For the foregoing reasons, all of plaintiff's claims are dismissed without prejudice
except claim L of plaintiff's first claim for relief. Plaintiff is directed to re-plead claim L
and provide a more definite statement of the nature of his non-disclosure claim and the
damages caused thereby. The Court denies defendants' motion for summary judgment
on claim L without prejudice; in the event that the plaintiff elects to continue to proceed

in federal court on claim L, defendants may renew their motion. A conference on this

matter shall be held on October 24, 2008 at 2:30 pm.


SO ORDERED.

Dated: New York, New York
      September 29, 2008

Richard J. Holwell
United States District Judge